**FILED**

February 28 2012

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 11-0379

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 45

IN RE THE MARRIAGE OF
CHARLES ANTHONY WHYTE,

        Petitioner and Appellant,

  and

LEANAH LOUISE COUVILLION,

        Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Twenty-First Judicial District, In and For the County of Ravalli, Cause No. DR 02-175 Honorable Jeffrey H. Langton, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

           Michael L. Hayes; Hays & Hayes, P.L.L.P.; Hamilton, Montana

      For Appellee:

           Linda Osorio St. Peter; St. Peter Law Offices, P.C.; Missoula, Montana

Submitted on Briefs:  December 21, 2011

Decided:  February 28, 2012

Filed:

_____
                      Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Charles Whyte appeals from an Order Amending Parenting Plan entered by the Twenty-First Judicial District Court, Ravalli County. We reverse and remand. We address the following issues:

¶2 *1. Did the District Court err in amending the parties' parenting plan?*

¶3 *2. Did the District Court err in delegating to C.A.W. the power to amend the parenting plan in the future?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Charles Whyte (Charles) and Leanah Couvillion (Leanah) were married in July 1996 and had one child, C.A.W., during their marriage, born in January 2000. The parties divorced in 2003. On May 22, 2003, the parties stipulated to a final parenting plan, which was incorporated into their divorce decree. Under this initial parenting plan, the parties shared equal parenting time and agreed that when C.A.W. started kindergarten, they would change the plan to implement a school schedule. In August 2005, the parties entered into a Stipulated Final Amended Parenting Plan (Parenting Plan), which detailed their parenting arrangements for C.A.W.'s school years.[1]

¶5 The Parenting Plan called for C.A.W. to live primarily with Leanah in Frenchtown, visiting Charles on weekends and during the summer, until he started sixth

---

[1] The parties signed the Stipulated Final Amended Parenting Plan on August 25, 2005 and followed it diligently thereafter but did not file the document with the court until March of 2011. Neither party raises any issue with regard to the delay in filing the plan.

grade, at which time the arrangement would switch, and he would reside primarily with Charles in Hamilton. The Parenting Plan provided:

> **School Schedule:** During the school year [C.A.W.] will reside primarily with Leanah from Kindergarten [sic] through fifth grade and visit his father on the weekends and all days that there is no school, as he is still young and the parties agree it would be in [C.A.W.]'s best interest to have the influence of the mother primarily during these young years. [C.A.W.] will then reside primarily with Charles from his sixth grade year until he graduates high school and will visit his mother on the weekends and all days that there is no school, as he will be growing into adolescence and the parties agree it would be in [C.A.W.]'s best interest to have the influence of the father primarily during these adolescent years.

¶6 The parties followed this plan from 2005 forward. However, in February 2011, during C.A.W.'s fifth grade year and as the change in residency arrangements was approaching, Leanah filed a motion to amend the Parenting Plan. She requested that the residency arrangement be revised so that C.A.W. would continue to live with her, rather than primarily residing with Charles. Leanah attached a letter to her motion explaining her reasons for requesting an amendment. She stated that C.A.W. was shy when he attended kindergarten, and she has worked with him to be more social by participating in the Boy Scouts. Leanah stated that she "feel[s] removing him from Frenchtown School would cause [C.A.W.] a significant amount of stress and that by putting him in a whole new school with a new student body, [C.A.W.] will regress back into a shy child." She also noted that C.A.W. is receiving extra help at the Frenchtown School and that she is "concerned that moving him will challenge [C.A.W.] in a way that could be difficult for him to recover from in a short amount of time and that his grades and self esteem will suffer."

3

¶7  The District Court conducted a hearing on Leanah's motion on May 20, 2011. The parties were both asked to describe their living situations and their relationships with C.A.W. Charles testified that he had remarried since the divorce and had three stepchildren who were ages 9, 12, and 16. He owns a four-bedroom, two-bathroom house on four acres of land in Hamilton. When C.A.W. stays with Charles, he shares a room with his stepbrother, although the home has an office that could be converted into a bedroom for C.A.W. if necessary. Charles has maintained employment as a fencing contractor. He noted that the family enjoys watching movies together, riding four-wheelers, having game night, going to church, and especially enjoy watching UFC martial arts fights. They often invite guests to their home to watch the fights and are generally a "pretty active bunch of people." Charles stated that upon C.A.W.'s move to Hamilton, C.A.W. could continue to participate in Boy Scouts, an activity with which C.A.W. is very involved in Frenchtown, and that C.A.W. already knows boys in the troop.

¶8  Charles acknowledged that C.A.W. expressed a desire to stay in school in Frenchtown with his current friends, but offered that C.A.W. has known all along that he would have to make the transition to a new school in sixth grade. Charles opined, "he wants to stay in the school because he has established friends there and – but, you know, I think the majority of it is a fear that he has of change . . . ." C.A.W., eleven years old at the time of trial, and his twelve-year-old stepsister would be attending the same school in Hamilton, and Charles noted, "both [of] them together would sit and talk about it, and

4

they both seemed excited to me because they'd be going to the same school." A friend of Charles' family testified that "[C.A.W.] has a lot of friends here. He has a lot of people who love him."

¶9 Leanah testified that for about a year she has lived in a two-bedroom basement duplex apartment in Frenchtown. She was unemployed but recently attained her high school diploma and was taking online classes to become a medical coder. Her boyfriend of over one year lives with her and C.A.W., and Leanah testified that C.A.W. and her boyfriend get along very well. She testified to several previous unhealthy relationships that led her to move to Missoula for a period of time. She was remarried for a while, and this man was "particularly hard on [C.A.W.]." She also lived with another man who "had a drinking problem and [Leanah] didn't want him around." Despite Leanah's moves, C.A.W. has remained enrolled in the Frenchtown school district.

¶10 Leanah testified that C.A.W. has had some difficulty with reading. She admitted on cross-examination that she received several notifications from the school that C.A.W. wasn't turning in his homework and had excessive afternoon absences but stated the reading problem has improved since she received those notifications and that she has talked to C.A.W. about the absences.

¶11 The court also spoke with C.A.W. *in camera*. C.A.W. expressed concern that the environment at his father's house would not be conducive to doing school work because there is "nowhere to be alone, so like if I had homework or anything, it would be too loud and stuff. And when I'm at my mom's, it's just quiet where I can do it." When the court

5

asked C.A.W. if he needs it to be quiet when he studies, he replied, "[s]ometimes, yeah." C.A.W. also expressed concern that he would not have alone time because his younger stepbrother followed him around. In seeming contradiction to Charles' actual work schedule as a fencing contractor—he is laid off during winter and works long hours in the summer—C.A.W. told the court he thought he would see his father more if the current schedule was maintained, i.e., permitting C.A.W. to be with his father in the summer and on weekends during the school year.

¶12 The District Court granted Leanah's motion to amend the Parenting Plan. The practical effect of the amendment was to continue the status quo, under which C.A.W. would continue to reside with his mother during the school year and visit his father on weekends, while primarily residing with his father during the summer and visiting his mother on summer weekends. Further, the District Court ruled by oral pronouncement that C.A.W. would determine future residential decisions by writing a letter to his parents by July 15 of every year advising them where he would like to stay. The District Court held that C.A.W.'s wishes "will prevail until he ages out," noting "I think he's mature enough that his wishes would likely be in his best interests."

¶13 Charles appeals.

**STANDARD OF REVIEW**

¶14 In determining whether the amendment of a parenting plan is appropriate, we review a district court's findings of fact to determine whether they are clearly erroneous. *In re Marriage of D'Alton*, 2009 MT 184, ¶ 7, 351 Mont. 51, 209 P.3d 251 (citing *In re*

6

*Marriage of Oehlke,* 2002 MT 79, ¶ 9, 309 Mont. 254, 46 P.3d 49). "Findings are clearly erroneous if they are not supported by substantial evidence, the court misapprehends the effect of the evidence, or this Court's review of the record convinces it that a mistake has been made." *Oehlke,* ¶ 17 (citations and quotations omitted). If the findings of fact upon which the decision to amend are predicated are not clearly erroneous, then we will only overturn the district court if there is a clear abuse of discretion. *D'Alton,* ¶ 7 (citing *Oehlke,* ¶ 9). A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice. *In re Marriage of Guffin,* 2010 MT 100, ¶ 20, 356 Mont. 218, 232 P.3d 888 (citation omitted). Conclusions of law are reviewed for whether they are correct. *Guffin,* ¶ 20.

## DISCUSSION

¶15     *1. Did the District Court err in amending the parties' parenting plan?*

¶16     Charles argues that Leanah did not satisfy her burden under the statute to prove there has been a change in circumstances or her burden of proving that amending the Parenting Plan was necessary for the child's best interest. Charles argues that all of the changes in circumstances were expressly contemplated by the parties at the time they entered into the Parenting Plan, and thus, under the statute, a change warranting amendment of the plan has not been demonstrated. The statute governing amendment of parenting plans provides:

> **Amendment of parenting plan – mediation.** (1) The court may in its discretion amend a prior parenting plan if it finds, upon the basis of facts

that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan, that a change has occurred in the circumstances of the child and that the amendment is necessary to serve the best interest of the child . . . .

Section 40-4-219, MCA.

¶17    At the hearing, Leanah was asked by Charles' counsel what she believed were the changed circumstances warranting an amendment of the Parenting Plan. She responded, "Well, the circumstances that have changed is [sic] he's older." She conceded that at the time she agreed to the Parenting Plan, it was understood that C.A.W. would be older at the time the switch in residential custody would take effect. She also agreed it was foreseeable that C.A.W. would be changing schools from Frenchtown to Hamilton at the time his residency would change.

¶18    For her appellate briefing, Leanah has retained counsel and shifted the emphasis of her argument from C.A.W.'s increase in age to his needs as a student who appreciates a quiet environment in which to complete his homework. She notes that Charles has three stepchildren in his home and argues that, in light of C.A.W.'s reading difficulties, he might have difficulty completing his school work and succeeding in school while living with Charles. Charles responds that the parties knew at the time they entered the agreement that the contemplated change in schools could initially be stressful until C.A.W. became acclimated to the change.

¶19    At the conclusion of the hearing, the District Court provided its reasoning in a ruling from the bench:

> And it's clear to me that both parents are fit and proper parents here. I don't think there's any issue about that. But we have had a change of circumstances in the sense that the agreement was made when he was just a little tyke, and now he's about to enter middle school and has a mind of his own and his wishes are entitled to greater—certainly greater weight now than they would have been when he was younger . . . . And he does at this point seem to greatly appreciate the—what he called a calmer atmosphere or more privacy in Frenchtown, and he does state that that was helpful to him for his school work. And so I respect the fact that there is a contract here, but on the other hand, if the contract dealt with property issues, I would be the first one to enforce it, but when it's dealing with children, you have to consider the best interest of the child as you go along, and I think right now it would—if I were to enforce the Agreement and require him to move the next school year in Hamilton, that he—it would be, I think, a very stressful thing for him . . . . So I'm going to grant the modification and allow him to—or maintain the current arrange—the arrangement that's current prevail [sic].

Thus, the District Court's reasoning was based upon C.A.W.'s increase in age, the greater weight to which his wishes should be entitled, and the calmer atmosphere or greater privacy C.A.W. enjoyed at his mother's house for doing schoolwork.[2]

¶20    While each parenting case is unique to its own circumstances, *D'Alton* raised similar issues and provides guidance. There, the father sought a change in the parenting plan, offering that circumstances had changed in the six years since the parenting plan had been entered because "both children are now in school and the children's nanny was terminated so that she is no longer 'a stabilizing force in the children's relationship,'" and

---

[2] The District Court's written order consisted of a form order wherein boxes were checked indicating that findings of fact and conclusions of law in the generic language of the statute were entered. No reasoning or reference to facts specific to this case was provided in the written order.

that the mother had attempted to frustrate the father's contact with the children. *D'Alton*, ¶ 10. Relevant to the issues here, we noted approvingly the District Court's statement that "[i]f the passage of six (6) years and the children both being in school is sufficient to warrant an amendment, then the courts would be flooded with motions to amend parenting plans in most if not all cases." *D'Alton*, ¶ 11. We added, "[i]ndeed, the mere aging of children so that they are now in school could hardly be considered 'unknown to the court at the time of entry of the prior plan' as required by § 40-4-219(1), MCA." *D'Alton*, ¶ 11. We agreed with the District Court that "these changed circumstances 'do not satisfy the initial threshold criteria'" under the statute for conducting a hearing on the matter. *D'Alton*, ¶ 11. Our discussion regarding the change of the children's age and school attendance applies with even more force here, where the parties' agreement expressly contemplated that C.A.W. would age and change schools when he reached sixth grade. These circumstances were known all along and were the basis of the agreement that the parties followed for six years.

¶21 At most, the only factual finding that could be considered a change of circumstance is the court's oral finding that C.A.W. enjoys greater peacefulness and privacy for doing schoolwork at Leanah's home. We acknowledge Leanah's concerns that the change in residency could cause stress for C.A.W. and disrupt his progress, but no findings of fact addressing these potential problems were made by the court.

¶22 It is at this juncture that the Dissenting Opinion yields to the temptation to search for evidence to support the District Court's decision, citing to testimony obviously

10

negative to Charles, such as "fighting," "yelling," and "cussing" asserted to have occurred in his home. Dissent, ¶ 39. However, this is not our function as an appellate court. We have no idea whether the District Court considered this evidence to be credible or factual, and it is not our duty to make such determinations. Indeed, if anything, the implication from the District Court's order is just the opposite—that it discounted such evidence by finding that "it's clear to me that both parents are fit and proper parents here. I don't think there's any issue about that." The Dissenting Opinion improperly usurps the fact finding function. Further, the Dissenting Opinion criticizes our mention of the District Court's use of a form order developed to assist litigants. Dissent, ¶ 41. We find no fault with the use of the form itself, but such forms do not bear this Court's imprimatur immunizing them from review or guaranteeing they will always successfully serve the purpose for which they are intended.

¶23 We are well aware that a district court has "broad discretion when considering the parenting of a child. 'Child custody cases often present the court with difficult decisions. We must presume that the court carefully considered the evidence and made the correct decision.'" *In re Marriage of Tummarello*, 2012 MT 18, ¶ 34, 363 Mont. 387, ___P.3d___ (citing *In re Parenting of N.S.*, 2011 MT 98, ¶ 18, 360 Mont. 288, 253 P.3d 863). However, as we recognized in *D'Alton*, cases involving amendment of existing parenting plans must satisfy an initial statutory threshold of changed circumstances. *D'Alton*, ¶ 11. The statute promotes stability for the children and discourages unnecessary litigation over parenting plans. Our cases have commonly considered

changes in circumstances of a more substantial nature. *See, Sian v. Kooyer*, 2010 MT 178, 357 Mont. 215, 239 P.3d 121 (a change of circumstances was found when father became disabled, moved out of state, and lost his employment); *In re Marriage of Clay*, 2007 MT 228, 339 Mont. 147, 168 P.3d 665 (changes in circumstance established by mother moving and having to drive 90 miles each way to deliver the children to and from school and households); *In re Marriage of Carter*, 2003 MT 19, 314 Mont. 84, 63 P.3d 1124 (mother moved out of state), *In re Marriage of Nies*, 2003 MT 100, 315 Mont. 260, 68 P.3d 697 (mother made unsubstantiated accusations that father sexually abused the child and repeatedly frustrated the father's visitation); *In re Marriage of Robison*, 2002 MT 207; 311 Mont. 246, 53 P.3d 1279 (mother was moving from state, and if she chose to stay in state, amendment entered reflected the parties' actual practices); *In re Marriage of Burk*, 2002 MT 173, 310 Mont. 498, 51 P.3d 1149 (children were living with grandparents rather than with father as ordered in parenting plan).

¶24    The parties had a longstanding parenting plan that was forward-looking and reflected their agreement that C.A.W. would live primarily with Leanah until he reached sixth grade, at which time the schedule would flip, and C.A.W. would live primarily with Charles. The parties followed the plan for six years with the expectation, particularly on Charles' part, that the plan would be followed as agreed. We understand that this is not strictly a contractual matter, as even the best laid plans for the care of a child may become ineffective over time. Still, the parties' commitments do mean something, especially when, as here, they are faithfully followed over many years and work well. On

12

this record, we conclude that the District Court's determination of changed circumstances required by § 40-4-219(1), MCA, was not supported by the evidence and that the statutory threshold was therefore not satisfied. *See D'Alton*, ¶ 11. The specific error here is that the District Court's findings entered from the evidence it received were insufficient to establish the statutory standard for amendment of the parenting plan. Consequently, the District Court's amendment of the Parenting Plan is reversed.

¶25 We note that C.A.W. is currently in the middle of his sixth grade year. In his briefing, Charles has requested, if he were to prevail, that C.A.W. not be required to change schools during the school year but that the change take effect at the beginning of C.A.W.'s seventh grade year. We agree and order that this matter be remanded for entry of an order by the District Court incorporating this relief.

¶26 *2. Did the District Court err in delegating to C.A.W. the power to modify the parenting plan in the future?*

¶27 The District Court held as follows:

> But I think [C.A.W.] should also have the opportunity each summer to make a decision by mid summer [sic] as to whether he wants to maintain that or whether he wants to come and reverse the situation, so I think he's mature enough that his wishes would likely be in his best interests, so the past arrangement will continue in effect. But then by July 15th each year, he'll be required to notify both his parents whether he wants that to continue or whether he'd like to reverse the living arrangements, and then that will prevail until he ages out.

¶28 Section 40-4-212, MCA, provides that the court shall determine a parenting plan in accordance with the best interest of the child, in consideration of "all relevant parenting factors." Section 40-4-212(1), MCA. Further, § 40-4-219(1), MCA, provides

that "[i]n determining the child's best interest under this section, the court may, in addition to the criteria in 40-4-212, also consider whether . . . (c) the child is 14 years of age or older and desires the amendment . . . ." Under these provisions, whether a parenting plan is appropriate is a legal conclusion that can only be made by a court. While consideration of the child's desires is statutorily required when the child is 14 years old, the ultimate decision is for the court to make, based upon the evidence, and cannot be delegated to the child. Here, C.A.W. was only eleven. The District Court's holding that C.A.W. will annually determine his own residential arrangements is reversed.

¶29 The order amending the Parenting Plan is vacated, the Parenting Plan is reinstated, and this matter is remanded for entry of an order consistent herewith.

/S/ JIM RICE

We concur:

/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT

Justice James C. Nelson, concurring.

¶30 I join the Court's Opinion. Where two undisputedly fit parents have agreed in writing to a reasonable parenting plan that takes into account the changing needs of their child and the opportunity for both parents to influence the child's development as the

14

child ages, that agreement should be enforced absent persuasive proof of harm to the child.

¶31 We have recited the principle so often that it has become mantra: The right of a natural parent to parent one's child is a constitutionally protected, fundamental liberty interest. *See Steab v. Luna*, 2010 MT 125, ¶ 22, 356 Mont. 372, 233 P.3d 351; *In re Custody & Parental Rights of D.A.*, 2008 MT 247, ¶ 18, 344 Mont. 513, 189 P.3d 631.[1] I suggest that if we really believe this principle, then it follows that in cases where, as here, there are fit natural parents and some unanticipated harm will not befall the child, parenting decisions should actually be made by the parents and not by the government. The case at bar presents none of the serious sorts of changes in circumstances that we have—properly—determined implicate the strict requirements of § 40-4-219(1), MCA. Opinion, ¶¶ 23-24.

¶32 To the contrary, the parents here, quite reasonably and responsibly, anticipated and agreed that C.A.W. would benefit from the influence of his mother in his early years and from the influence of his father after the fifth grade. There is absolutely no evidence that this decision, made by the natural parents, is now unfounded or antithetical to the child's best interests. Indeed, there has been *no* change in circumstances. Rather, the parents anticipated and resolved the very circumstances which have now been presented to the District Court as "changed" circumstances.

---

[1] This principle of law is so well established and so often cited that the cases are legion, and a lengthy string cite will add nothing to the discussion.

¶33 The fact that C.A.W. must change schools is a circumstance that children are often faced with—their parents move; their parents divorce; school district boundaries change; the parents want the child to attend one school over another for any number of reasons. Changing their child's school is the sort of decision that parents make. The fact is that children often benefit from changing schools, and there is no persuasive evidence in this case that C.A.W. will not survive—and grow from—this change in his life. More to the point, change is something that we all had to, and have to, learn to cope with. Changes, even those that seem initially unpleasant, are the stuff of life and life's lessons that need to be learned. And if C.A.W. needs peace and quiet in which to study, there is no reason to believe that his father will not—as would any fit and loving parent—accommodate that need.

¶34 In my view, Leanah's grounds and "evidence" for amending the parenting plan here are meritless. Neither meets the strict standards we have set under § 40-4-219(1), MCA. In the final analysis, it is the job of fit, natural parents to *parent* their child. It is the parents' job to make decisions about the child's schooling, and to make all of the other decisions that parents make as their child ages. *Parenting* is not the job of district courts or this Court in circumstances where both parents are fit, capable, and loving, and where there is no persuasive evidence of harm to the child.

¶35 Here, the District Court inserted itself into a parenting decision that was not its to make under either the facts or the law in this case. The District Court clearly abused its

discretion in crediting Leanah's grounds and "evidence" and in amending the parenting plan.

¶36    I concur completely in the Court's decision.


/S/ JAMES C. NELSON


Justice Beth Baker, dissenting.

¶37    As the Court acknowledges (Opinion, ¶ 23), we apply a presumption in child custody cases "that the court carefully considered the evidence and made the correct decision." *In re Marriage of Everett*, 2012 MT 8, ¶ 29, 363 Mont. 296, ___ P.3d ___ (quoting *N.S.*, ¶ 18); *Marriage of Tummarello*, ¶ 34.  Unless this Court can determine from the record that the findings upon which a modification decision is predicated are clearly erroneous, we do not disrupt the decision of a district court in a child custody matter absent a clear abuse of discretion. *Jacobsen v. Thomas*, 2006 MT 212, ¶ 13, 333 Mont. 323, 142 P.2d 859; *In re Arneson-Nelson*, 2001 MT 242, ¶ 22, 307 Mont. 60, 36 P.3d 874; *In re J.M.D.*, 259 Mont 468, 473, 857 P.2d 708, 712 (1993).

¶38    Unquestionably, a finding of changed circumstances is a "prerequisite" to amending a prior parenting plan. *Jacobsen*, ¶ 17.  But that is a factual finding, which—like all other factual findings—is reviewed for clear error. *Jacobsen*, ¶ 13.  The appellant faces the high hurdle of demonstrating abuse of discretion and must show that the district court acted "arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Albrecht v. Albrecht*, 2002 MT 227,

17

¶ 7, 311 Mont. 412, 56 P.3d 339. "Arbitrary" is synonymous with a "failure to exercise honest judgment," "depending on the will alone[,]" or "without consideration and regard for facts and circumstances presented." *Black's Law Dictionary* 104 (6th ed., West 1990).

¶39 To say the District Court here acted either unreasonably or arbitrarily without employment of conscientious judgment gives insufficient effect to our standards of review, dismisses the role of the trial judge, and presumes appellate judges collectively can make a better judgment about a child's life from reading a transcript. Judge Langton held a hearing at which both parties were present in person. He watched them on the witness stand and observed their testimony. He heard testimony from other witnesses for the parties, including Leanah's friend and child care provider who related (without objection) C.A.W.'s fears and concerns that he would regress in the successes for which he had fought to improve his grades. He interviewed eleven-year-old C.A.W. in his chambers. Discounting his factual finding that the circumstances of this family had changed does not give appropriate deference to Judge Langton or a fair reading to the record. In the time since Charles and Leanah divorced, Charles married a woman with three children who live with them full-time; there are often arguments in Charles's family home, which C.A.W. described to Judge Langton as "fighting," "yelling," and "cussing"; C.A.W.'s development between his preschool years to fifth grade resulted in struggles with academics, but he showed progress with the help of teachers at the school he has attended since first grade; and C.A.W. told the judge he wants to live in his mother's

18

home with a calmer environment where he feels it is easier for him to do homework. These circumstances have arisen since the prior plan and were unknown to the court at the time the plan was entered. Section 40-4-219(1), MCA; *Jacobsen*, ¶ 16. We have cited the blending of families as one factor a district court may consider. *Clay*, ¶¶ 25-26. Neither the court nor C.A.W.'s parents could have anticipated C.A.W.'s needs upon the blending of Charles's family and as C.A.W. matriculated through school. As Judge Langton observed, unlike the typical request to modify a parenting plan, Leanah's request sought to *preserve* the child's status quo, which the court determined was in C.A.W.'s best interests.

¶40 While the evidence in the record is limited, it is a gross overstatement to say the district court acted arbitrarily in determining these new factors in C.A.W.'s life amounted to a change in the circumstances of the child for purposes of § 40-4-219(1), MCA. The statute expressly grants the district courts discretion to make that determination; it does not list specific factors that must be found before such a change may be deemed sufficient or require that a change in circumstances be "substantial"—a factor the Court has imported in its analysis here. Opinion, ¶ 23; *see* § 1-2-101, MCA. The statute sets no threshold other than that the amendment be necessary to serve the best interest of the child. Section 40-4-219(1), MCA. Judge Langton was in a far better position than are we to decide the change was sufficient to keep the parties' current parenting schedule in place.

19

¶41 We must remember that the focus of any parenting plan proceeding is not the parents' lives, or whether the parents are staying true to agreements they made years earlier affecting their child. The focus is the child, and what is in that child's best interest. *Robison*, ¶ 27 (the burden of proof under § 40-4-219, MCA, is the best interests of the child standard). In making that determination, the trial court considers the criteria stated in § 40-4-212, MCA.

> These criteria include the wishes of the child's parent or parents; the wishes of the child; the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interests; the child's adjustment to home, school and community; and continuity and stability of care.

*Guffin v. Plaisted-Harman*, 2010 MT 100, ¶ 29, 356 Mont. 218, 232 P.3d 888 (quoting *Robison*, ¶ 28). Judge Langton looked carefully at the wishes of C.A.W. when interviewing him in chambers; learned about his relationship with his step-siblings; and heard testimony on the importance of continuity and stability in his home, school, and community. Judge Langton made his determination based upon a conscientious review of these factors. While the Court faults him for checking boxes on a form order, such forms were created by a Commission of this Court in an effort to facilitate the handling of pro se family law matters by district courts increasingly burdened with cases brought by self-represented litigants in such matters.[1] Judge Langton's reasoning was reflected in his comments from the bench, in which—as the Court quotes (Opinion, ¶ 19)—he made clear his ruling was based on the best interest of the parties' child, the child's wishes, and

---

[1] http://courts.mt.gov/supreme/boards/self_represented_litigants/approved.mcpx (last accessed 02/23/2012).

the different environments at the two households. We do not require specific findings on each factor in the statute, only that the district court "set forth the 'essential and determining facts upon which [it] rested its conclusion on the custody issue.'" *Carter*, ¶ 14 (citations omitted). And we have held the district court's findings on a modification petition will be upheld as long as they imply a finding of change in circumstances. *Burk*, ¶ 11. This is consistent with our application of the doctrine of implied findings in reviewing findings of fact. That doctrine provides that "where 'findings [of fact] are general in terms, any findings not specifically made, but necessary to the [determination], are deemed to have been implied, if supported by the evidence.'" *In re Transfer of Location for Mont. All-Alcoholic Bevs. Resort,* 2008 MT 165, ¶ 29, 343 Mont. 331, 184 P.3d 324 (quoting *Caplis v. Caplis*, 2004 MT 145, ¶ 32, 321 Mont. 450, 91 P.3d 1282, and *State v. Wooster*, 2001 MT 4, ¶ 18, 304 Mont. 56, 16 P.3d 409). Here, the evidence supports the District Court's finding of changed circumstances.

¶42 Again, we have consistently refrained that the district judge is in a superior position to this Court in making such assessments. *In re J.M.D.*, 259 Mont. at 473, 857 P.2d at 712; *In re Marriage of Graham*, 2008 MT 435, ¶ 8, 347 Mont. 483, 199 P.3d 211 (citing *Czapranski v. Czapranski*, 2003 MT 14, ¶ 10, 314 Mont. 55, 63 P.3d 499). The presumption of the district court's careful consideration and correct decision making in this arena has been upheld many times. *In re Marriage of Hedges,* 2002 MT 204, ¶ 17, 311 Mont. 230, 53 P.3d 1273 (noting our "firm belief" that the trial court is in a better position than this Court); *In re Marriage of McKenna*, 2000 MT 58, ¶ 17, 299 Mont. 13,

21

996 P.2d 386 ("it is not this Court's role to second-guess the fact-finding function of the District Court" as the trial court is in a better position to resolve child custody issues). While the Court expresses concern that allowing the parents to upend their prior agreement will invite more modification proceedings, consider the impact of this Court's willingness to substitute its judgment for that of the district courts in determining a child's best interest.

¶43   The Court agrees with Charles's contention that *D'Alton* compels reversal of Judge Langton's order.  There, applying the same abuse of discretion standard, we found the father had not met his burden of showing that the district court's findings were clearly erroneous, nor did he substantiate his claim that the court abused its discretion.  *D'Alton*, ¶ 11.  We upheld the District Court's conclusion that the mere "passage of six (6) years" and the termination of the children's nanny were insufficient to support a finding of changed circumstances.  *D'Alton,* ¶ 11.  Our holding was not that a child's development can never be considered a factor for purposes of "changed circumstances."  Rather, we simply refused to substitute our judgment for that of the fact-finder, holding instead that the district court did not act without employment of conscientious judgment in making its conclusion in that particular set of circumstances.  We should do the same here.

¶44   Upholding the District Court's findings in this case properly gives credence to our standards of review.  Application of our standards of review does not always produce identical results in what may seem to be similar cases.  *Compare N.W. Truck & Trailer Sales v. Dvorak*, 265 Mont. 327, 332-35, 877 P.2d 31, 34-36 (1994) (District Court did

22

not abuse its discretion in ruling that the litigant demonstrated excusable neglect and good cause justifying an extension of time for filing a notice of appeal) *with Sadowsky v. City of Glendive*, 259 Mont. 419, 423, 856 P.2d 556, 559 (1993) (District Court did not abuse its discretion in ruling that the litigant failed to demonstrate excusable neglect or good cause justifying an extension of time for filing a notice of appeal). The facts present in *D'Alton* are not the same as those presented here. Like *N.W. Truck* and *Sadowsky* demonstrate, the standard of review serves as a check on abuse of a district court's authority, but not as a means of imposing what we think might be a better result were we in the district judge's position.

¶45 The law can be a poor mechanism for crafting solutions to disputes that have their genesis in personal relationships. But it is the best dispute-resolution system there is, and the sole recourse for separated families. The system only works if we give appropriate deference to those in a position to watch, listen, observe and judge the human interactions and communications on which those relationships are built. The bottom line is that, in an ordinary custody case such as this, the Montana Supreme Court should not be deciding where a child attends the sixth (or seventh) grade.

¶46 Finally, I disagree that Judge Langton gave veto power to C.A.W. over his residential schedule. While the court stated during the hearing that the child was to write a letter to his parents each summer, the written parenting plan that was entered by the court and controls the parenting of C.A.W. adopted Leanah's proposed residential schedule and said nothing about an automatic modification at the child's wishes. Any

23

change in the parenting plan would have to be presented by motion and determined by the court. Section 40-4-219, MCA.

¶47    I respectfully dissent.

/S/ BETH BAKER


Chief Justice Mike McGrath and Justice Brian Morris join in the dissenting Opinion of Justice Baker.

/S/ MIKE McGRATH
/S/ BRIAN MORRIS