FILED

06/16/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0795

DA 25-0795

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 128N

IN RE THE MARRIAGE OF:

PRESTON BULL,

      Petitioner and Appellant,

  and

JACQUELINE BULL,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR-21-681
Honorable Shane A. Vannatta, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Misty D. Gaubatz, A&M Law, Missoula, Montana

      For Appellee:

      Brandi R. Ries, Emily A. Lucas, Ries Law Group, P.C., Missoula, Montana

                Submitted on Briefs:  April 29, 2026

                        Decided:  June 16, 2026

Filed:

                      _____
                               Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Preston Bull (Preston) appeals from the decree of dissolution entered by the Fourth Judicial District Court, Missoula County, challenging parenting and financial provisions. Preston and Jacqueline Bull (Jackie) were married in January 2010, resided in Montana, and have three daughters: A.B., born in 2012; E.B., born in 2016; and K.B., born in 2018.

¶3 The District Court found that "Preston was physically and emotionally abusive to Jackie (including in the presence of the children) and the parties' children throughout the parties' marriage." The specific findings included that Preston would frequently punch walls, slam things around the house, and throw things in anger. He would grab and push Jackie, and told her, "a bullet to the brain sounds like the answer." He cocked a firearm in the presence of Jackie and one of the children, while the other children were in the residence, threatened Jackie and said, "this is the end." He held A.B. by her arms against a wall with her feet dangling above the ground, threw cups of water in her face, and forced her to stand in front of a mirror when she was crying, telling her to look at herself and see how ugly she was. He removed all her toys from her bedroom, saying she did not deserve them. He would call Jackie and the children, particularly A.B., derogatory names, often

2

give Jackie and the children the "silent treatment" as a method of emotional abuse, and threatened to commit suicide. Jackie testified at the dissolution hearing that, on the day of the parties' separation, following the incident in which Preston pushed Jackie, Preston took the parties' middle child outside where he kept a gun in his truck, and asked the child if she "want[ed] to come with [him] while Daddy kill[ed] himself?" The District Court found that, during the marriage, Preston drank heavily on a daily basis, "even when he was the parent in charge of supervising and caring for the parties' minor children."

¶4 The couple separated on August 9, 2021, after which Jackie sought, and was granted, an order of protection against Preston for herself and the three children, which was made permanent. Preston filed a Petition to Adopt Parenting Plan and Request for Hearing in October 2021, and Jackie filed her response and her own proposed parenting plan in November 2021.

¶5 Preston initially engaged in individual therapy, and Jackie and the children did so throughout the course of the case, with the sessions conducted individually between each daughter and a therapist. Sessions would occasionally include Jackie to promote healthy attachment. The two older children were diagnosed with Post Traumatic Stress Disorder (PTSD), and the youngest was diagnosed with Adjustment Disorder. Jackie and the children's counselor expressed concerns that the children would be negatively impacted by frequent contact with Preston, and during the period following the parties' separation Preston was permitted to see the children only on weekly supervised visits. The therapy

3

process became a significant part and concern of the proceeding, from which the District Court entered findings to adopt the final parenting plan.

¶6 The District Court appointed Donna Ryngala, Ph.D., as a parenting evaluator and she submitted her report in July 2022. The report documented Ryngala's concerns about Preston's ability to parent the children, namely, his struggles with substance abuse, continuing significant mental health needs that he has failed to do any meaningful work to address, including dropping out of therapy, and his high risk for future violence. The report recommended that "Jackie be solely responsible for decision making regarding the children's education, health, extracurricular activities and community involvement," and that, if Preston was able to demonstrate the improvement on his identified issues, "consideration should be given to including him in on events and activities as it is deemed appropriate." Ryngala recommended a neutral party monitor Preston's visits with the children and that he have no contact with the children outside of the supervised visits.

¶7 Clinical psychologist, Cindy Miller, Ph.D., conducted and observed visits between Preston and the three children. Her September 2022 report indicated that, while the children demonstrated excitement at seeing their father, their behavior after the visits showed "significant regression in their ability to regulate their behavior and emotions, which lasts for many days after visits." She reported that Preston's visits with the children were changed from weekly to biweekly, and recommended that until the girls' responses after the visits regulated, Preston should not have increased visits with the children. After conducting 14 supervised visits between Preston and the children, Miller's November 2022

4

update reported that A.B., the oldest child, had missed the most recent five visits, and the youngest had missed two visits. Miller described the visits as "a mix of positive and negative," because, on the one hand, the girls seemed to be happy to see their father and he seemed to be making progress towards fostering a deeper emotional connection with the girls, but on the other, Preston experienced difficulty with accepting perspectives other than his own. At the conclusion of a visit with the two youngest children, the girls asked to change the visits from weekly to biweekly. Preston responded that he was spending a great deal of money on the process and if they did not want to see him, they should just stop the visits entirely. Further, Miller stated that Preston seemed to be growing increasingly antagonistic with his own therapist in his individual sessions, which increased to such a degree that Preston ceased attending his sessions.

¶8 Miller withdrew in June 2023, and the District Court appointed Kim Brown Campbell, LCPC, ATR to serve as the new therapeutic supervisor for the supervised visits. Campbell reported that Preston failed to see the benefit of individual therapy and maintained that supervised visitation with the children was unreasonable because he felt that he had "done nothing wrong." Campbell recommended that the children be allowed to decide when they were comfortable participating in visits with Preston. In March 2024, Campbell withdrew because Preston expressed disagreement with her progress reports and she believed "the ethical decision [was] to withdraw from th[e] case and refer the matter back to the court."

¶9 Ryngala completed another parenting evaluator's report in October 2024. Ryngala had met with the children, the parties, Campbell and other therapists involved in the case, observed Preston with the younger children, and reviewed documents. Her report stated that Preston had difficulty accepting responsibility for his actions and choices, but rather "blamed the attorneys, the mental health providers and Jackie for keeping the children from him." Ryngala observed that Preston seemed to show more interest in E.B., the middle daughter, than he did in the other daughters. Ryngala recommended that, due to Preston's inability to continue with his individual counseling, the supervised visits should continue with the children having an option to decline to attend.

¶10 The parties submitted their proposed final parenting plans in March 2025. Jackie's plan requested, regarding the supervised visits, "if a child(ren) does not want to attend Father's parenting time, the child(ren) should not be required to attend." Further, Jackie's amended final plan proposed that "[t]he parents shall share equally in all costs for the children's extra-curricular activities, including extra-curricular activity registrations and equipment expenses."

¶11 A final dissolution hearing was held before the District Court on May 13 and 14, 2025. The District Court issued Findings of Fact, Conclusions of Law, and Decree of Dissolution (Order) on June 23, 2025, which adopted Jackie's proposed final amended parenting plan. In the Order, the District Court noted that "[d]espite Preston's mental health being at issue, Preston submitted proof of work he has done to address his chemical dependency but failed to provide any proof of work he has done specifically to address his

6

mental health." The District Court reasoned that, "[b]ased on the clear and thorough insight provided by multiple professionals in this matter, coupled with Preston's history of perpetrating violence on Jackie (in the presence of the children) and on the children, his substance abuse, and untreated mental health needs, the [c]ourt finds that Preston is unable to provide continuous and stable care for the parties' children." The District Court further concluded that Preston's "demonstrated inability or rather unwillingness to participate in the therapeutic process that would be necessary in order for the children to feel safe in his unsupervised care has rendered it detrimental to the children's best interests to have frequent and continuing [contact] with Preston outside of supervised parenting time." The court thus awarded primary physical custody to Jackie, and adopted the conditions of visitation in her proposed final plan, including that if the children did not want to attend visitation sessions with Preston, they would not be required to do so.[1] The Order further held that, in accordance with the Montana Child Support Guidelines, Preston would pay $274 a month for each child, for a total of $822 a month, in child support, based upon his annual income of $62,409.09, and that Preston and Jackie should equally share the uncovered medical and insurance expenses of the children. The District Court found that Jackie's income had ranged from $238,551 in 2021 to $109,519 in 2023. Lastly, the Order adopted Jackie's request for a 50-50 sharing of the children's extracurricular activity costs.

¶12     Preston appeals.

---

[1] The District Court made Preston's contact with the children an exception to the Permanent Order of Protection.

¶13　Broad discretion is given to district courts in making parenting plan determinations. *Bessette v. Bessette*, 2019 MT 35, ¶ 13, 394 Mont. 262, 434 P.3d 894 (citation omitted). "We review parenting plan determinations and modifications for a clear abuse of discretion." *Bessette*, ¶ 13 (citation omitted). The district court abuses its discretion if it "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586 (quotation omitted). A finding of fact is clearly erroneous if it is "not supported by substantial evidence, the court misapprehended the effect of the evidence, or, based on our review of the record, we have a definite and firm conviction that the lower court was mistaken." *Bessette*, ¶ 13 (citation omitted). We review a district court's conclusions of law for correctness. *Bessette*, ¶ 13 (citation omitted).

¶14　The court must consider the "best interests of the child" in its determination of a parenting plan. Section 40-4-212(1), MCA. In determining what the best interests of the child are, "[t]he court shall consider all relevant parenting factors," including:

> (a) the wishes of the child's parent or parents;
> (b) the wishes of the child;
> (c) the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interest;
> (d) the child's adjustment to home, school, and community;
> (e) the mental and physical health of all individuals involved;
> (f) physical abuse or threat of physical abuse by one parent against the other parent or the child;
> (g) chemical dependency, as defined in 53-24-103, or chemical abuse on the part of either parent;
> (h) continuity and stability of care;

.　.　.

8

(l) whether the child has frequent and continuing contact with both parents, which is considered to be in the child's best interests unless the court determines, after a hearing, that contact with a parent would be detrimental to the child's best interests. In making that determination, the court shall consider evidence of physical abuse or threat of physical abuse by one parent against the other parent or the child, including but not limited to whether a parent or other person residing in that parent's household has been convicted of any of the crimes enumerated in 40-4-219(8)(b).

(m) adverse effects on the child resulting from continuous and vexatious parenting plan amendment actions.

Section 40-4-212(1), MCA.

¶15 Preston argues that the District Court abused its discretion by placing the decisions about his parenting time "solely on the shoulders of the children," which "allows Jackie to ignore her affirmative responsibility as a parent to nurture a positive regard for Preston in the parties' children," citing *In re Whyte,* 2012 MT 45, 364 Mont. 219, 272 P.3d 102. Jackie answers that the District Court did not err by permitting the children to determine if they would attend the visits with Preston because the District Court was "statutorily mandated to take into consideration the children's wishes when determining a final parenting plan," and that the parenting plan reflects the advice of the children's counselors and the order of protection in keeping the children's contact with Preston restricted to the supervised visits. Additionally, she states that no evidence indicates that she did anything subversive of the children's relationship with their father.

¶16 In *In re Whyte*, the District Court held that the child, age 11, would make an annual decision about which parent he would reside with for the following year. *In re Whyte*, ¶ 27 ("by July 15th each year, he'll be required to notify both his parents whether he wants that

to continue or whether he'd like to reverse the living arrangements"). In addition to noting that the child was only 11 years old, we held that, "[w]hile consideration of the child's desires is statutorily required when the child is 14 years old, the ultimate decision is for the court to make, based upon the evidence, and cannot be delegated to the child." *In re Whyte*, ¶ 28. Unlike in *In re Whyte*, the Order here does not delegate the determination of living arrangements to the child, but rather permits the children, who were subject to abuse by Preston and diagnosed with consequential disorders, to have a say in the pace of their recovery by deciding when to participate in supervised visitation with Preston. From the record, it appears the children may well want to visit with their father when the time is appropriate for them. The District Court assessed the individual factors under § 40-4-212, MCA, particularly, Preston's history of physical and emotional abuse, his reticence to meaningfully engage with his own mental health provider, and the recommendations of professionals. The children's safety and their comfort were of primary importance, the District Court made the best-interest safety determinations and set the supervised schedule itself, and treated non-compulsion as a protective condition for the children. The provisions adopted by the District Court did not permit the children to decide parenting time, did not contradict *In re Whyte*, and were not error under the circumstances here.

¶17 Secondly, Preston argues the District Court erred by requiring him to pay, in addition to child and medical support, half of the children's extracurricular fees. He first contends that Jackie did not request the District Court to grant reimbursement of these costs, and did not present evidence or testimony about the amount of those expenses. He

further argues that "[t]he extracurricular activities and equipment are solely at Jackie's discretion, and there is no financial cap on the amount or cost of those," and notes that Jackie's income exceeds his income. He argues that his "child support and medical support obligations have been calculated pursuant to Montana statutory law," and that he cannot "afford to pay an additional, discretionary amount on top for extracurricular activities and equipment, nor does Montana law support such a financial imposition." Jackie disagrees, noting that her proposed amended parenting plan included a provision requiring that the children's extracurricular registration and equipment expenses be shared equally, she testified about those activities, and Preston failed to present any alternatives to the distribution of the children's extracurricular expenses at the dissolution hearing. She argues that such expenses, although outside of child support, are appropriately assessed to further the children's "enrichment and socialization," and that the children's father should be expected to contribute to them.[2]

¶18    Admin. R. M. 37.62.123 (1998), Supplements to Primary Child Support Allowance, recognizes additional costs related to a child's support beyond the designated child support amount, including child care, health insurance, and "other needs of the child as determined by the circumstances of the case, including other health related costs." Admin. R. M. 37.62.123(1)(c) (1998)[3] Section 40-4-234, MCA, governing final parenting

---

[2] These expenses were not explicitly addressed within the Order entered June 23, 2025. The Order adopted Jackie's proposed amended plan "in its entirety as the Final Parenting Plan for the parties' minor children," which included the equal cost sharing provision. Neither party argues that the requirement of equal sharing was not ordered by the District Court.

[3] Jackie was ordered to pay all child care costs.

plans, authorizes provisions broadly addressing "finances to provide for the child's needs," § 40-4-234(2)(d), MCA, and recognizes a child's "education," "spiritual development," and "health care and physical growth" needs. Section 40-4-234(2)(h), MCA. Further, "[t]he total supplemental needs of the child are divided proportionately between the parents according to the parental share[.]" Admin. R. M. 37.62.123(2) (1998). Thus, expenses such as extracurricular costs may be included in a child's support provisions.

¶19 Here, the District Court determined the amount of child and medical support in accordance with the Montana Child Support Guidelines. For purposes of child support, the court found that Preston's annual income was $62,409.09, and Jackie's annual income was $154,039. At a minimum, the court should have required that the expenses would be divided in proportion to the parties' incomes, but more, the extracurricular expense provision was not adequate to properly address the issue. As noted above, no mention was made of this issue in the Order itself, which incorporated by reference the proposed final parenting plan submitted by Jackie, including an equal cost sharing provision. As the parties note, testimony about the children's extracurricular activities was very limited. Consequently, we remand for consideration of, with appropriate findings, the reasonable scope and allocation of activity and equipment expenses, Preston's ability to contribute to them in addition to child support and medical expenses, and whether the circumstances warrant adoption of a reasonableness limitation, advance notice or consent, a cap, or other dispute resolution mechanism. The District Court may conduct such further proceedings

12

as necessary to accomplish this purpose and, thereafter, enter an amended decree reflecting this modification.

¶20 Therefore, we affirm the parenting provisions of the Order, and remand for further proceedings consistent herewith.

¶21 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶22 Affirmed in part, reversed in part, and remanded for an entry of an amended decree in accordance herewith.

/S/ JIM RICE

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ KATHERINE M. BIDEGARAY

13