DA 11-0681

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 321

CHARLES KELLY KLUVER; KARSON
KLUVER; and GENIE LAND COMPANY,

Plaintiffs and Appellants,

and

DOUGLAS & KIM McRAE; and GREENLEAF
LAND & LIVESTOCK COMPANY,

Plaintiffs and Appellees,

v.

PPL MONTANA, LLC, as a Successor in
Interest to the Montana Power Co.; PUGET
SOUND ENERGY, INC.; NORTHWESTERN
CORPORATION; THE CLARK FORK AND
BLACKFOOT, LLC.; THE MONTANA POWER
COMPANY, LLC.; AVISTA CORPORATION;
PACIFICORP; PORTLAND GENERAL ELECTRIC
COMPANY and JOHN DOES 1-20,

Defendants and Appellees.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
In and For the County of Rosebud, Cause No. DV 07-12
Honorable Joe L. Hegel, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Robert K. Baldwin (argued); Brian K. Gallik; Goetz, Gallik & Baldwin,
P.C., Bozeman, Montana

Mark D. Parker; Casey Heitz; Parker, Heitz & Cosgrove, PLLC, Billings,
Montana

For Appellees:

Tom W. Stonecipher (argued); Margaret C. Weamer; Tarlow Stonecipher & Steele, PLLC, Bozeman, Montana
W. William Leaphart, Attorney at Law, Helena, Montana
(McRaes and Greenleaf Land & Livestock Co.)

Guy W. Rogers (argued); Jon A. Wilson; Brown Law Firm, P.C., Billings, Montana
Thomas W. Stoever, Jr.; Timothy R. MacDonald; Arnold & Porter, LLP, Denver, Colorado
(PPL Montana, LLC, Puget Sound Energy, Inc., Northwestern Corporation; Pacificorp; The Clark Fork and Blackfoot, LLC; The Montana Power Company, LLC, and Avista Corp.)

Shane P. Coleman; Jason S. Ritchie; Holland & Hart, LLP, Billings, Montana
(Portland General Electric Company)

Argued: September 21, 2012
Submitted: October 2, 2012
Decided: December 31, 2012

Filed:

_____
Clerk

2

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    Charles Kelly Kluver, Karson Kluver, and Genie Land Company (collectively the "Kluvers") appeal two orders of the Sixteenth Judicial District Court, Rosebud County; one involving rulings on evidentiary motions, and the other granting a motion to enforce a settlement agreement in favor of PPL Montana, LLC, Puget Sound Energy, Inc., Northwestern Corporation, the Clark Fork and Blackfoot, LLC, the Montana Power Company, LLC, Avista Corporation, Pacificorp, Portland General Electric Company, John Does 1-20, (collectively the "Power Companies"), and Douglas McRae, Kim McRae, and Greenleaf Land and Livestock Company (collectively the "McRaes").  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    The Kluvers and McRaes are neighbors and ranchers in Rosebud County.  In February 2007, they commenced a lawsuit against the Power Companies[1] alleging that the Colstrip power facility, which borders land owned by the Kluvers and McRaes, contaminated groundwater under their property.  The Kluvers and McRaes were represented by Monte Beck (Beck), John Amsden (Amsden), Jory Ruggiero (Ruggiero) and Brett Engel (Engel).  The Power Companies' counsel included Guy Rogers (Rogers), Thomas Stoever (Stoever), and Stephen Redshaw (Redshaw).

---

[1] Hydrometrics, Inc. was also a defendant in the case.  The claims against the corporation were resolved through settlement, and the cause of action against Hydrometrics was consequently dismissed with prejudice.

3

¶3     After over three years of litigation, on July 14, 2010, the parties assembled in

Billings to participate in a mediation to see if a negotiated settlement could be reached.

Present at the mediation were the mediator, the Kluvers and their wives, Beck, Ruggiero,

Engel, Rogers, Stoever, Redshaw, and Gordon Criswell (Criswell), an employee of PPL

Montana and a representative for the Power Companies.  The McRaes did not attend, but

authorized their counsel to proceed with the mediation and agree to a settlement on their

behalf.  The mediation lasted the entire day, concluding at approximately 10:00 p.m. with

the transmission of a Memorandum of Understanding (MOU) as an email from Ruggiero

to Rogers and copied to other counsel.

¶4     The relevant portions of the MOU are as follows:

> The following terms memorialize the global settlement agreement between
> all Plaintiffs in this matter . . . and all Defendants . . .
>
> Defendants shall pay all Plaintiffs [_____] dollars.[2]
>
> Plaintiffs shall sign a global release of all defendants . . . [that] shall include
> all past, present and future claims . . . [that] arise out of the subject matter
> of this lawsuit. . . .
>
> Within 60 days, Plaintiffs shall convey fee simple title to the following
> lands to Defendant PPLM:
>
> [Sections 3 and 10 in their entirety, [t]he Southwest 8th of section 33 and
> all of section 4 that Plaintiffs own.  This land is demarcated on the map
> held by the mediator].
>
> Within 60 days, Defendants and Plaintiffs shall enter into a renewable,
> ninety-nine (99) year lease whereby Defendants shall lease to Plaintiffs [all

---

[2] The parties agreed that the amount to be paid by the Defendants to the Plaintiffs would remain
confidential.

land conveyed above and Section Nine]. This lease shall entitle Plaintiffs to make all uses of the surface . . . .

Within 60 days, Defendants and Plaintiffs shall enter into a perpetual first option to purchase whereby Plaintiffs . . . shall be entitled to the first right to purchase [all land conveyed above and Section Nine] for the sum of One (1) dollar.

This Memorandum has been reviewed and approved by the parties and their counsel copied herein.

¶5 On the evening of July 14, 2010, Engel called the McRaes and informed them that a settlement had been reached at the mediation. A few days later, Karson Kluver went to the McRaes' home and expressed relief that the case was over, appreciation that the McRaes participated in the case, and sadness that he would have to part with some of his land as part of the settlement. As a result of this conversation, the McRaes both thought the Kluvers believed the parties reached a settlement at the mediation.

¶6 On July 19, 2010, Ruggiero filed a Notice of Tentative Settlement with the court. During the next few weeks, there were email communications between counsel discussing different aspects of the settlement, primarily those dealing with the real estate transactions and the documentation necessary to complete them. In some of these emails the MOU was referred to as a "draft."

¶7 A few weeks after the mediation, Doug McRae and the Kluvers had a conversation at a store in Miles City. The Kluvers told Doug that they had met with a tax attorney who informed them that the proceeds from the settlement would not be as great as they had anticipated, and they therefore were having reservations about accepting the settlement.

5

On September 14, 2010, at the insistence of the Kluvers, Ruggiero filed a Notice Regarding Failure of Settlement Discussions. It stated that the "tentative settlement has now failed and has resulted in no final, enforceable settlement agreement."

¶8 Approximately two weeks later, the Power Companies filed a Motion to Enforce Settlement Agreement and Request for Evidentiary Hearing, arguing that the MOU was a written and signed settlement agreement. They attached affidavits of Rogers, Criswell, and Redshaw discussing the negotiations at the mediation. Later, Beck, Ruggiero and Engel also filed affidavits with the court reporting what occurred at the mediation.

¶9 The Kluvers objected to the Power Companies' Motion and filed a Motion to Strike the Defendants' Brief and Affidavits. They maintained there was no enforceable settlement agreement and that the Power Companies relied upon confidential and privileged settlement negotiations that were inadmissible pursuant to the mediation confidentiality statute. The McRaes did not share the same position as the Kluvers; instead, they agreed with the Power Companies that the MOU was an enforceable agreement.

¶10 Several motions followed, which prompted the District Court to order a hearing for February 17, 2011. Following the hearing, the court ordered, among other things, that the Kluvers waived any right to confidentiality of the fact of a settlement and that the affidavits presented by the Power Companies were admissible. It ordered the mediator to submit a report to the court indicating whether a settlement was reached. It further

6

scheduled an evidentiary hearing for March 21, 2011, to determine whether the MOU was an enforceable settlement agreement.

¶11    Pursuant to the District Court's order, the mediator filed a report on March 21, 2011, stating that the case had settled at the July 14, 2010, mediation.

¶12    At the March 21, 2011, evidentiary hearing, Rogers, Ruggiero, Beck, Criswell and the McRaes testified. The Kluvers did not. Among other things, the witnesses testified that the case settled at the mediation and the MOU and map were a final expression of the terms of the settlement. The testimony revealed details about the mediation process, including how the MOU was created and transmitted between the parties. Specifically, Ruggiero testified that during the mediation he sat in the same room as the Kluvers and that they authorized him to draft and send the MOU to opposing counsel at the conclusion of the mediation. The witnesses also explained some of the MOU's terms, particularly those involving the land transactions and the "perpetual first option to purchase." In addition, they addressed the parties' failure to complete certain duties specified in the MOU within the required 60-day period following the mediation. Rogers testified that because the Kluvers had fired their counsel, they could no longer communicate with them regarding these tasks. The McRaes also provided testimony regarding the conversations they had with the Kluvers following the mediation.

¶13    During the hearing, the MOU and map were admitted into evidence.

¶14    On October 20, 2011, the court issued its Findings of Fact, Conclusions of Law, and Order, in which it granted the Power Companies' and McRaes' (collectively

7

"Appellees") Motion to Enforce the Settlement Agreement, and ordered the parties to complete the settlement set forth in the MOU within 60 days. The Kluvers appealed this order, along with the court's February 23, 2011, order involving rulings on the evidentiary motions. We heard oral argument on September 21, 2012, and the matter is now ripe for disposition.

¶15 The parties raise several arguments on appeal. We address the following three issues:

¶16 *Issue One: Did the District Court err by finding that the MOU was a binding, enforceable settlement agreement?*

¶17 *Issue Two: Did the District Court err by allowing parol evidence to change an option to purchase into a right of first refusal?*

¶18 *Issue Three: Did the District Court err in allowing evidence about the conduct of the mediation, including testimony from the Kluvers' former attorneys and the mediator, to determine whether the parties reached a binding settlement agreement during the mediation?*

**STANDARD OF REVIEW**

¶19 Both the existence of a contract and its interpretation are questions of law which we review for correctness. *Hurly v. Lake Cabin Dev., LLC*, 2012 MT 77, ¶ 14, 364 Mont. 425, 276 P.3d 854. We review a trial court's factual findings for clear error. *Hurly*, ¶ 14. A trial court has broad discretion in determining the relevance and admissibility of evidence. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811.

8

However, the trial court is bound by the Rules of Evidence or applicable statutes. *Derbyshire*, ¶ 19. The trial court's interpretation and construction of a statute or rule is a matter of law, which we review de novo to determine whether the court's interpretation and construction of the statute or rule is correct. *State v. Dist. Ct. of the Eighteenth Jud. Dist.*, 2010 MT 263, ¶ 31, 358 Mont. 325, 246 P.3d 415.

## DISCUSSION

¶20 *Issue One: Did the District Court err by finding that the MOU was a binding, enforceable settlement agreement?*

**Statute of Frauds and the Uniform Electronic Transactions Act**

¶21 The Kluvers argue that neither they nor Ruggiero signed the MOU, and the agreement therefore does not satisfy the statute of frauds. The statute of frauds is codified in §§ 28-2-903 and 70-20-101, MCA. Pursuant to § 28-2-903(1)(d), MCA, "an agreement for the leasing for a longer period than 1 year or for the sale of real property . . . is invalid unless the authority of the agent is in writing and subscribed by the party sought to be charged." Additionally, § 70-20-101, MCA, provides that an interest in real property may not be transferred unless there is an instrument in writing, subscribed by the party transferring it or by the party's lawful agent authorized by writing. *Hayes v. Hartelius*, 215 Mont. 391, 396, 697 P.2d 1349, 1353 (1985).

¶22 The Kluvers contend that the District Court improperly relied on the Uniform Electronic Transactions Act (UETA) "to dispense with the requirement of a signature by either Kluvers or their supposed agent." The UETA was adopted by the Montana

9

Legislature in 2001 to address the increase in electronic transactions. The hope was for the Act to allow more business to be done electronically. *See* Mont. H. Comm. on Bus. and Lab., *Minutes of the Hearing on H. Bill 234,* 57th Legis., Reg. Sess., page 7 (Jan. 16, 2001). The bill's sponsor stated that its passage would show a confidence in electronic transactions as a legal process. *See* Mont. H. Comm. on Bus. and Lab., *Minutes of the Hearing on H. Bill 234,* 57th Legis., Reg. Sess., page 8 (Jan. 16, 2001).

¶23 With this in mind, we turn to the relevant portions of the UETA and their applicability to the case before us. The UETA applies to transactions between parties who have agreed to transact by electronic means. Section 30-18-104(2), MCA. This is determined by the context and surrounding circumstances, including the parties' conduct. Section 30-18-104(2), MCA. The UETA provides that a record, signature or contract may not be denied legal effect or enforceability solely because it is in electronic form. Sections 30-18-106(1), (2), MCA. Further, "if a law requires a record to be in writing, an electronic record satisfies the law," and "if a law requires a signature, an electronic signature satisfies the law." Sections 30-18-106(3), (4), MCA. An electronic signature is an "electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Section 30-18-102(9), MCA. To determine the effect of an electronic signature, we look to the "context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement . . . ." Section 30-18-108, MCA.

10

¶24 Here, it is clear from the MOU that the parties agreed to memorialize the terms of their settlement by electronic means. The MOU is a writing created in email format on Ruggiero's computer during the mediation and explicitly states that the parties reviewed and approved it. At the conclusion of the mediation, it was transmitted by email from Ruggiero to Rogers. Even so, the Kluvers maintain that there is no evidence that they agreed to sell their land by electronic means. In making this argument, the Kluvers not only disregard the MOU, but also the statements Karson Kluver made to the McRaes after the mediation acknowledging that a settlement had been reached at the mediation. Because the MOU was the only settlement agreement that resulted from the mediation, Karson Kluver's statements corroborate that the parties intended to memorialize their agreement electronically. The UETA therefore applies.

¶25 Further, it is evident on the face of the MOU that Ruggiero, as an agent for the Kluvers and McRaes, provided the requisite electronic signature. In addition to the UETA, the District Court relied on *Hillstrom v. Gosnay*, 188 Mont. 388, 614 P.2d 466 (1980) to determine that the MOU was a signed document. Although decided prior to the UETA, *Hillstrom* is consistent with the UETA's recognition of the validity of electronic signatures. In *Hillstrom,* we noted that although we had not yet ruled on what constitutes a valid subscription for purposes of the statute of frauds, "[o]ther courts . . . have consistently held that any mark affixed to a writing with the intent to authenticate it constitutes a sufficient subscription by the party sought to be charged." *Hillstrom*, 188 Mont. at 394, 614 P.2d at 469 (internal citations omitted). We determined that a

11

typewritten name at the bottom of a telegram was a sufficient subscription to satisfy the requirements of the statute of frauds. *Hillstrom*, 188 Mont. at 394, 614 P.2d at 469. Further, we found the subscriber's intent to authenticate her typewritten name on the telegram as her valid subscription was established on the face of the telegram which states, "PLEASE CONSIDER THIS MY WRITTEN ACCEPTANCE . . . ." *Hillstrom*, 188 Mont. at 395, 614 P.2d at 470.

¶26   Here, Appellees point to the paragraph at the bottom of the MOU that states, "This Memorandum has been reviewed and approved by the parties and their counsel copied herein," as the necessary "symbol" of an electronic signature. We find that this statement, taken together with the fact that the email containing the MOU designates Ruggiero as the sender—his name is specifically typed out in front of his email address in the "From" section of the email—and Rogers as the recipient, and was sent from Ruggiero to Rogers at the conclusion of the mediation, provide the necessary symbol and intent to authenticate to constitute Ruggiero's electronic signature.

¶27   The Kluvers argue that even if Ruggiero did sign the MOU, it is invalid because they never gave him written authorization to bind them to a contract to sell land. Pursuant to § 28-2-903(1)(d), MCA, an agreement for the sale of real property, "if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing and subscribed by the party sought to be charged." *See also Schwedes v. Romain*, 179 Mont. 466, 471, 587 P.2d 388, 391 (1978). Appellees concede that there was no written authorization, but assert that an exception to this rule exists when the

12

principal is in the physical presence of the agent and directs the agent to act. They rely on a California case, *Videau v. Griffin*, 21 Cal. 389, 392 (Cal. 1863), in which the California Supreme Court held:

> The only exception to the rule that an authority to execute a deed must be conferred by writing, is where the execution by the attorney is in the presence of the principal. The exception arises from the doctrine that what one does in the presence of and by the direction of another is the act of the latter – as much so as if it were done by himself in person.

Other jurisdictions have carved out similar exceptions.[3]

¶28    The cases the Kluvers rely upon in support of their position are distinguishable from the present case. In each of those cases, not only was there no written authorization from the principal, but there was no indication that the agent was acting while in the physical presence of the principal. *See Zier v. Lewis*, 2009 MT 266, 352 Mont. 76, 218 P.3d 465; *Mahoney v. Lester*, 118 Mont. 551, 168 P.2d 339; *Schmidt v. White*, 43 S.W.3d 871 (Mo. App. 2001); *Central Idaho Agency, Inc. v. Turner*, 442 P.2d 442 (Idaho 1968); *Guel v. Bullock*, 468 N.E.2d 811 (Ill. App. 1984); *Tostenson v. Ihland*, 147 N.W.2d 104 (N.D. 1966); *Bennett v. First Natl. Bank of Glens Falls*, 536 N.Y.S.2d 591 (N.Y. App. Div. 1989). We are in accord with the proposition that when an agent and principal are in physical proximity, such as in the context of a mediation session, the principal can

---

[3] *See e.g. Bigler v. Baker*, 58 N.W. 1026, 1029 (Neb. 1894) ("[t]he character of a power under which an agent may execute a deed for another depends upon the presence or absence of the principal. If it is signed in his presence by his direction, an oral request to do the act is all that is required.") (Internal citation omitted); *Leaf v. Codd*, 240 P. 593, 596 (Idaho 1925) ("[o]ne may write and execute an instrument by the hand of another when done in his presence and by his direction, and the fact may be proved by parol evidence, and an action may be brought upon the instrument without violating the statute of frauds.").

13

authorize the agent to sign a contract involving realty on the principal's behalf without written authorization.

¶29 Here, while the Kluvers allege that they were not in the same room as Ruggiero when he sent the MOU, the District Court did not make such a finding, and the Kluvers do not specifically challenge the court's failure to do so. We conclude that because Ruggiero attended the entire mediation with the Kluvers as their attorney, the MOU explicitly states that the parties reviewed and approved it, and Karson Kluver later told the McRaes that a settlement had been reached, there is no clear error in the District Court's finding that the Kluvers authorized Ruggiero to agree to the MOU.

¶30 Furthermore, the purpose of the statute of frauds is to prevent fraud. In this case, the McRaes presented unchallenged testimony that Karson Kluver acknowledged the settlement when he visited their home a few days after the mediation. In *Hayes*, we determined that the statute of frauds was inapplicable when the parties admitted the existence of a contract. We pointed out that "[t]his Court has taken the position on several occasions that it will not allow the statute of frauds, the object of which is to prevent fraud, to be used to accomplish fraudulent purposes." *Hayes*, 215 Mont. at 396, 697 P.2d at 1353 (internal citations omitted). There, we stated that "it would be a fraud on the defendant to allow plaintiffs to admit to the contract, and then allow them to avoid its obligations by asserting the statute of frauds." *Hayes*, 215 Mont. at 396, 697 P.2d at 1353. *See also Hillstrom*, 188 Mont. at 396, 614 P.2d at 470 (stating that "in cases involving admitted contracts, we have construed the statute of frauds less technically,

14

refusing to allow the statute to be used so as to defeat its purpose to prevent the commission of a fraud."). Here, because Karson Kluver acknowledged that a settlement had been reached when he spoke with the McRaes after the mediation, he cannot now attempt to invoke the statute of frauds to deny the existence of such an agreement.

**Essential Terms of the MOU**

¶31 Settlement agreements are contracts, subject to the provisions of contract law. *Murphy v. Home Depot*, 2012 MT 23, ¶ 8, 364 Mont. 27, 270 P.3d 72. A contract requires (1) identifiable parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration. *Hurly*, ¶ 17 (citing § 28-2-102, MCA). A contract must contain all its essential terms in order to be binding. *Hurly*, ¶ 17.

¶32 Here, the District Court found that the MOU and map contain all of the material terms of a contract, and concluded that they constitute an enforceable settlement agreement. The parties do not dispute that the MOU identifies parties capable of contracting. Nor do they challenge that there is sufficient consideration—the MOU provides an amount of money to be paid by the Power Companies to the Kluvers and McRaes, real estate to be transferred from the Kluvers to the Power Companies, a leaseback, a right of first refusal, and a release of future claims. The Kluvers contend, however, that the MOU lacks consent and contains illegal objects.

¶33 With respect to their consent argument, the Kluvers claim the MOU is an unenforceable agreement to agree, and that the parties' statements and conduct indicate their intent not to be bound. The intentions of parties are those disclosed and agreed to in

15

the course of negotiations. *Hetherington v. Ford Motor Co.*, 257 Mont. 395, 399, 849 P.2d 1039, 1042 (1993). A party is bound to a settlement agreement if "he or she has manifested assent to the agreement's terms and has not manifested an intent not to be bound by that assent." *Lockhead v. Weinstein*, 2003 MT 360, ¶ 12, 319 Mont. 62, 81 P.3d 1284 (citing *Hetherington*, 257 Mont. at 399, 849 P.2d at 1042). In other words, if parties unconditionally consent to an agreement, they are bound. *Murphy*, ¶ 8 (citing *Lockhead*, ¶ 13). A party's latent, or undisclosed, intention not to be bound does not prevent the formation of a binding contract. *Murphy,* ¶ 8 (citing *Lockhead*, ¶ 11).

¶34    In *Marta Corp. v. Thoft*, 271 Mont. 109, 894 P.2d 333 (1995), we held the parties were bound to a settlement agreement when they agreed to general terms at a settlement conference and their attorneys subsequently prepared a written stipulation. After the stipulation was drafted and signed by counsel, one of the parties argued it was unacceptable and refused to comply with its terms. We determined that because the parties were present and represented at the settlement conference, at which time the general terms of the stipulation were formulated and agreed to by the parties, and there were no conditions placed on the parties' acceptance of the agreement, the parties were bound by the terms of the written stipulation. *Marta*, 271 Mont. at 113, 894 P.2d at 335. "That Appellants no longer wish to be bound by the settlement agreement, as set forth in the written stipulation, does not excuse them from complying with the terms of that stipulation." *Marta*, 271 Mont. at 113, 894 P.2d at 335.

16

¶35 In the instant case, the District Court found that the Kluvers assented to the terms of the MOU and map at the mediation. While the court's finding was based upon evidence that included testimony from the evidentiary hearing discussing the mediation, we arrive at the same conclusion by looking solely at the MOU and map. Similar to *Marta*, the Kluvers were present and represented at the mediation when the terms of the MOU were negotiated. The MOU contains an explicit statement that it was "reviewed and approved" by the parties. Further, like *Marta*, there is nothing on the face of the MOU suggesting that the Kluvers did not intend to be bound by it, or that their acceptance was conditional or contingent in any way.

¶36 The Kluvers argue that since the settlement gave the parties additional time to prepare final documents, all of the essential terms were not agreed to at the end of the mediation and the MOU was thus an unenforceable agreement to agree. This Court has held that where parties intend to form a binding agreement, the fact that they plan to incorporate it into a more formal contract in the future does not render it unenforceable. *Steen v. Rustad*, 132 Mont. 96, 104, 313 P.2d 1014, 1019 (1957). "[A]bsolute certainty and completeness in every detail is not a prerequisite of specific performance, only reasonable certainty and completeness being required. Those matters which are merely subsidiary, collateral, or which go to the performance of the contract are not essential, and therefore need not be expressed in the informal agreement." *Steen*, 132 Mont. at 106, 313 P.2d at 1020 (internal citations omitted).

¶37 In our recent decision in *Hurly*, we found there was an enforceable agreement between Lake Cabin, a company seeking to acquire real estate for development purposes, and Hurly, a landowner, even though the contract left specifications regarding some of its terms to be settled later. *Hurly*, ¶¶ 21-22. The two parties signed an agreement providing that Hurly would sell his property to Lake Cabin in exchange for certain cash payments and the building of additional structures on the lot, including houses, garages, and a dock. *Hurly*, ¶ 7. Although the parties stipulated that there were details regarding the structures that would later have to be decided on, such as the floor plans, we determined there was sufficient information provided in the contract "to make the parties' obligations 'clearly ascertainable.' " *Hurly*, ¶ 21 (quoting *GRB Farm v. Christman Ranch, Inc.*, 2005 MT 59, ¶ 11, 326 Mont. 236, 108 P.3d 507). The fact that the parties provided for general plans in the contract but left specifications to be settled later "indicate[d] their understanding that these additional terms were not material." *Hurly*, ¶ 21. We concluded the agreement included all essential terms to find it was a binding and enforceable contract. *Hurly*, ¶ 22.

¶38 Here, like *Hurly*, the parties' decision to include all of the terms they were agreeing to in the MOU and map, but allow the necessary documents related to the land transactions to be completed in the weeks following the mediation, indicates their recognition that the documents would not involve new, material terms. We find that the MOU contains all the information necessary to create the documents and to make the parties' obligations "clearly ascertainable." Therefore, the fact that there was not

18

"absolute certainty and completeness in every detail" of the MOU does not render it unenforceable.

¶39 The Kluvers also put much weight on the fact that the parties described the MOU as a "draft" and a "tentative settlement" in post-MOU communications, arguing this indicates there was no binding agreement. The District Court found that while the use of the word "tentative" in the Notice was "inartful and, in hindsight, imprecise, none of it constitutes an admission or supports an inference that the MOU and the map did not express a final, agreed-upon settlement, nor do any of these post-mediation statements constitute an agreement by the parties to, in any fashion, amend or change the material terms of settlement described in the map and the MOU." We agree. As just discussed, there is nothing in the MOU that indicates the parties' intent was for it to be anything but an enforceable agreement.

¶40 The Kluvers additionally argue, albeit very briefly, that the MOU is unenforceable because it contains illegal objects. We find these arguments unpersuasive and agree with the District Court's conclusion that the provisions of the MOU are legal under Montana law.

¶41 Lastly, the Kluvers raise the point that the parties failed to perform their duties within the 60-day period set forth in the MOU. Although Appellees argue that they were precluded from doing so because the Kluvers fired their counsel and stopped communication with them, the District Court made no such finding. This Court has adopted the doctrine of implied findings for the purpose of reviewing findings of fact.

19

The doctrine provides that where findings of fact " 'are general in terms, any findings not specifically made, but necessary to the [determination], are deemed to have been implied, if supported by the evidence.' " *In re Whyte*, 2012 MT 45, ¶ 41, 364 Mont. 219, 272 P.3d 102 (quoting *In re Transfer of Location for Mont. All-Alcoholic Bevs. Resort*, 2008 MT 165, ¶ 29, 343 Mont. 331, 184 P.3d 324). In the instant case, the evidence in the record, combined with the District Court's specific findings of fact, support a finding that the duties were not completed in the 60-day period because the Kluvers were in the process of firing their counsel and attempting to rescind the agreement.

¶42 For the foregoing reasons, we conclude the District Court did not err by finding that the MOU was a binding, enforceable settlement agreement.

¶43 *Issue Two: Did the District Court err by "re-writing" the MOU to change an option to purchase into a right of first refusal?*

¶44 The Kluvers argue the District Court should not have admitted parol evidence to determine the meaning of the "perpetual first option to purchase" in the MOU. By doing so, they assert the court converted the option to purchase into a right of first refusal.

¶45 The provision in the MOU reads:

> Within 60 days, Defendants and Plaintiffs shall enter into a perpetual first option to purchase whereby Plaintiffs, their heirs and assigns shall be entitled to the first right to purchase [all land conveyed above and Section Nine] for the sum of One (1) dollar.

In its order, the District Court instructed the parties to complete the settlement set forth in the MOU and map, which shall include "the creation of an instrument providing the

20

Kluver Plaintiffs the right to purchase the land conveyed for a sum of One Dollar ($1.00) upon Defendants' decision to convey the property." While the Kluvers claim the court altered the terms of the MOU, Appellees maintain that when the language of the MOU is read in context of the entire agreement, it is clear that the parties always intended a right of first refusal.

¶46     Section 28-3-402, MCA, provides that a contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. Courts generally "read the instrument as a whole to determine whether the parties intended an option or a right of first refusal." *Lee v. Shaw*, 251 Mont. 118, 122, 822 P.2d 1061, 1062 (1991); *see also Steen*, 132 Mont. at 102, 313 P.2d at 1018 (stating that "[i]t is well established that a court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties, but will grasp the instrument by its four corners and in the light of the entire instrument, ascertain the paramount and guiding intention of the parties."). An option to purchase is a right acquired by a contract by which the owner of property agrees with another person that he shall have the right to buy his property at a fixed price within a certain time. *Lee*, 251 Mont. at 121, 822 P.2d at 1062. The offer "creat[es] in the optionee a power to compel the owner to sell property at a stipulated price whether or not the owner wishes to sell." *Lee*, 251 Mont. at 121, 822 P.2d at 1062. A right of first refusal, on the other hand, is a "preemptive right" that requires the owner of property "*when and if he decides to sell*, to

21

offer the property first to the person entitled to the preemption, at the stipulated price."
*Lee*, 251 Mont. at 121, 822 P.2d at 1062.

¶47     Here, although the wording of the "perpetual first option to purchase" in the MOU is inartful, when read in context of the entire agreement and the "matter to which it relates," it is evident that the parties intended to agree to a right of first refusal instead of an option. The MOU specifically provides a "first" option and a "first" right. Given the meanings of an option to purchase and a right of refusal, the use of the word "first" only has significance when talking about rights of refusal. A "first option to purchase" makes sense when referring to a party who has the opportunity to buy property before anyone else in the event the owners intend to sell—this is a right of first refusal. In an option, as Appellees point out, there is no concern about being secondary because the party always has the right to buy the property, for the specified period of time.

¶48     Further, the purpose of the mediation was to resolve the Kluvers' and McRaes' claims against the Power Companies and give them protection against future litigation. Among other things, the Power Companies agreed in the MOU to pay the Kluvers and McRaes a sum of money, and the Kluvers promised to transfer them their land. The MOU also provides for a leaseback to the Kluvers so they can continue to use the property. These land transactions were a substantial part of the MOU. They demonstrate the importance to the Power Companies that they own the land to protect against future claims, and to the Kluvers that they continue to use the land and ultimately have the opportunity to purchase it back when the Power Companies sell. Given the purpose and

22

context of the MOU, it does not make sense that the parties would make these agreements, but intend for the Kluvers to have the option to purchase all the land back at any time—perhaps even the next day—for $1.  Instead, it is clear that the parties intended to agree to a right of first refusal.

¶49     Although the District Court admitted testimony discussing the meaning of this provision of the MOU, the MOU alone is sufficient to support the court's conclusion that the parties agreed to a right of first refusal.  The District Court therefore did not "convert" a material term of the MOU.

¶50     *Issue Three:  Did the District Court err in allowing evidence about the conduct of the mediation, including testimony from the Kluvers' former attorneys and the mediator, to determine whether the parties reached a binding settlement agreement during the mediation?*

¶51     The Kluvers argue the District Court violated both the mediation statute and the attorney-client privilege by allowing evidence about the conduct and communications that occurred at the mediation.  We address each of these arguments in turn.

**Mediation Statute**

¶52     Montana law expressly prohibits the disclosure of "all mediation-related communications, verbal or written" made during mediation absent consent or an express statutory exception.  Section 26-1-813(3), MCA.  The statute affords broad protection of mediation confidentiality, providing, in relevant part:

(2) Except upon written agreement of the parties and the mediator, mediation proceedings must be:

(a) confidential . . .

(3) A mediator's files and records, with the exception of signed, written agreements, are closed to all persons unless the parties and the mediator mutually agree otherwise. Except as provided in subsection (5), all mediation-related communications, verbal or written, between the parties or from the parties to the mediator and any information and evidence presented to the mediator during the proceedings are confidential. The mediator's report, if any, and the information or recommendations contained in it, with the exception of a signed, written agreement, are not admissible as evidence in any action subsequently brought in any court of law . . . and are not subject to discovery or subpoena in any court . . . unless all parties waive the rights to confidentiality and privilege.

(4) Except as provided in subsection (5), the parties to the mediation and a mediator are not subject to subpoena by any court . . . and may not be examined in any action as to any communication made during the course of the mediation proceeding without the consent of the parties to the mediation and the mediator.

(5) The confidentiality and privilege provisions of this section do not apply to information revealed in a mediation if disclosure is:

(a) required by any statute;

(b) agreed to by the parties and the mediator in writing . . . ; or

(c) necessary to establish a claim or defense on behalf of the mediator in a controversy between a party to the mediation and the mediator.

¶53 The District Court concluded that since the Kluvers acknowledged the existence of a settlement to the McRaes after the mediation, they waived their mediation confidentiality rights. The Kluvers argue that this conversation is not a valid waiver of rights under § 26-1-813, MCA. In the construction of a statute, this Court's job is

24

"simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. The plain language of this statute requires a *written* waiver by all the parties *and* the mediator before their confidentiality rights can be waived. Section 26-1-813(5)(b), MCA (emphasis added). Here, there is no evidence of a written waiver signed by the parties and the mediator, and we thus determine the Kluvers did not waive the confidentiality provided by § 26-1-813, MCA.

¶54 The Kluvers assert that the District Court erred when it allowed into evidence numerous mediation-related communications, including the MOU, and when it ordered the mediator to file a report. They argue that since none of the exceptions apply, all evidence relating to what occurred at the mediation was inadmissible.

¶55 "In interpreting a statute, we look first to the plain meaning of the words it contains. Where the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation." *Rocky Mt. Bank v. Stuart*, 280 Mont. 74, 80, 928 P.2d 243, 246 (1996) (internal citations omitted). Here, with regard to some of the evidence at issue, the statute is very clear. Section 26-1-813(3), MCA, states, and the Kluvers concede, that a signed, written agreement created during the mediation is admissible. We have already determined such an agreement exists; therefore, the court did not err in admitting the MOU into evidence. The statute also plainly provides that it protects communications that took place *during* the course of the mediation proceeding, but does not cover conversations regarding the mediation that occurred at a later time and

25

place. *See In re Estate of Stukey*, 2004 MT 279, ¶ 71, 323 Mont. 241, 100 P.3d 114 (determining that because a letter referencing mediation was written post-mediation it was "thus, not a part of the mediation process, [and] § 26-1-813, MCA, is inapplicable."). Therefore, evidence regarding conversations that occurred between the Kluvers and McRaes after the mediation was not protected. Finally, with regard to the mediator's report, the plain language of the statute is clear— "the mediator's report, if any, and the information or recommendations contained in it" are confidential. We recognize that the Uniform Mediation Act, as well as some jurisdictions,[4] has created an exception to the inadmissibility of mediator reports to allow mediators to disclose to the court whether a settlement was reached at mediation. Our Legislature, however, has not written this exception into the statute, and until it decides to do so, all mediator reports are confidential. The court thus erred in requiring the mediator to file his report.

¶56   With respect to all of the evidence the District Court admitted that involved communications made during the mediation, Appellees argue they were "really more ministerial (*e.g.*, here is our offer, I accept your offer, this constitutes our agreement) than compromise," and pertained more to conduct than actual conversations. Hence, they claim, such evidence was not protected by § 26-1-813, MCA. We disagree. While the statute does not explicitly state what does and does not constitute a "communication" for purposes of confidentiality, we can make such a determination by looking at its plain

---

[4] *See e.g.* Idaho Code § 9-807(2)(a) ("A mediator may disclose . . . [w]hether the mediation occurred or has terminated, whether a settlement was reached, and attendance. . . .").

26

language, legislative history, and other jurisdictions' interpretation of similar statutes. The Montana Legislature adopted § 26-1-813, MCA (1999), to preserve confidentiality in mediation. Proponents of the bill emphasized that mediation was a growing method of resolving disputes, founded on two key principles—that the parties feel free to speak their mind, and that their confidence will be maintained. *See* Mont. Sen. Comm. on Jud., *Minutes of the Hearing on H. Bill 593*, 56th Legis., Reg. Sess., page 11 (March 15, 1999). Because the statute is designed to promote a candid exchange, the participants must be assured that what they say will not be used against them through later court proceedings.

¶57    Idaho adopted a mediation confidentiality statute similar to Montana's. It specifically defines mediation communication as a "statement, whether oral or in a record or verbal or nonverbal, that occurs during a mediation . . . ." Idaho Code § 9-802(2). This is the same definition found in the Uniform Mediation Act. *See* Unif. Mediation Act § 2(2) (2001). More specifically, the comment to this statute provides that communications "include both statements and conduct meant to inform, because the purpose of the privilege is to promote candid mediation communications." Idaho Code § 9-802(2), cmmt 2. If nonverbal conduct is intended as an assertion, such as nodding, it would be a "communication." Idaho Code § 9-802(2), cmmt 2. By contrast, if the conduct was not meant by the actor as an assertion, "such as smoking a cigarette during the mediation" or the actor's "physical presence" at the mediation, the conduct typically would not be a "communication." Idaho Code § 9-802(2), cmmt 2.

27

¶58 This description of what constitutes "mediation communication" is in conformity with the broad policy of mediation confidentiality in § 26-1-813, MCA. We therefore determine that all of the evidence of conversations and conduct that occurred at the mediation was confidential under § 26-1-813, MCA, with the exception of such information as who was physically present at the mediation, when it began and ended, and any other non-verbal conduct that was not intended as an assertion.

¶59 We note that since the statute does not include any special provisions allowing disclosure of confidential information to prove or refute contract defenses, parties arguing for or against the enforceability of a contract created during mediation are quite limited in the evidence they can use to support their case. Some state legislatures have addressed this issue by explicitly providing exceptions to mediation confidentiality in their statutes when the enforceability of the mediated agreement is at issue.[5] However, our Legislature conspicuously did not, and to carry out its purpose of encouraging mediation by ensuring strict confidentiality we are reluctant to allow exceptions. As stated above, it is not the job of this Court to insert into those statutes what the Legislature has chosen to omit.

¶60 Here, although we conclude that the District Court erred by admitting evidence protected under the mediation confidentiality statute, we hold that such error was harmless. " '[H]armless error does not mandate that we reverse a district court judgment;

---

[5] *See e.g.* Wyo. Stat. § 1-43-103 (provides there is no mediation confidentiality if "one of the parties seeks judicial enforcement of the mediated agreement."); La. R.S. 9:4112 (allows an exception to mediation confidentiality if the court "determines that testimony concerning what occurred in the mediation proceeding is necessary to prevent fraud or manifest injustice."); Wis. Stat. § 904.085 (provides an exception to mediation confidentiality if the court "determines that admission is necessary to prevent a manifest injustice . . . .").

an error must cause substantial prejudice to warrant reversal.' " *In re Mental Health of A.S.B.*, 2008 MT 82, ¶ 36, 342 Mont. 169, 180 P.3d 625 (quoting *Matter of S.C. and L.Z.*, 2005 MT 241, ¶ 29, 328 Mont. 476, 121 P.3d 552). The MOU, map, and post-mediation conversations between Karson Kluver and the McRaes—all admissible under § 26-1-813, MCA—are sufficient evidence to find that the parties entered into a binding, enforceable agreement at the mediation. Thus, even if the District Court had excluded the confidential information from the mediation, it would have arrived at the same conclusion. Therefore, the District Court's incorporation of confidential information was harmless error.

## Attorney-Client Privilege

¶61 The Kluvers further argue that the District Court violated the attorney-client privilege when it admitted into evidence mediation-related communications. However, since we determined that admitting this evidence in violation of § 26-1-813, MCA, was harmless error, the same would be true if it violated attorney-client privilege—we still would have sufficient admissible evidence supporting the District Court's conclusion that the MOU was an enforceable agreement. We therefore need not decide whether admitting such evidence violated the attorney-client privilege.

## CONCLUSION

¶62 We hold the District Court erred in admitting evidence protected by the mediation confidentiality statute. We conclude, however, that the error was harmless. Therefore,

we hold the District Court properly granted the motion to enforce the settlement agreement.

¶63 Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JIM RICE
/S/ BRIAN MORRIS

Justice James C. Nelson, dissenting.

¶64 I agree with the Court's conclusions that the mediator's report was confidential, that all of the evidence of conversations and conduct that occurred at the mediation was confidential, and that the District Court erred by admitting evidence protected under the Mediation Confidentiality Statute. Opinion, ¶¶ 55, 58, 60. I do not agree, however, with the Court's conclusion that the District Court's error was harmless. Opinion, ¶ 60. The Court's conclusion in this regard is predicated on its determination that the so-called Memorandum of Understanding is an enforceable contract. Opinion, ¶¶ 42, 55, 60. In my view, the Court goes too far in crafting its decision to uphold the Memorandum. The Court's analysis is built on ignoring parts of the Mediation Confidentiality Statute, creating exceptions to blackletter law, and stacking one mistake on top of another. In its

30

efforts to enforce the Memorandum, I believe the Court does serious damage to the Mediation Confidentiality Statute, not to mention the attorney-client privilege laws, as well as the Statute of Frauds and the Uniform Electronic Transactions Act. I would reverse, and I thus respectfully dissent from the Court's contrary decision.

## I. The Memorandum of Understanding

¶65 Lest there be any confusion about what the "Memorandum of Understanding" actually is, it is not a tangible document detailing terms and conditions of a contractual agreement and containing pen-and-ink signatures at the bottom. Nor is it the record of an electronic transaction where a purchaser entered her credit card information into a merchant's website and hit the "Submit Order" button. What we are dealing with here is an email—not a document *attached* to an email; rather, just an email. Naturally, this email does not contain a traditional pen-on-paper signature; the email itself is simply bytes retained in computer memory. That fact is not necessarily fatal, however, because the Uniform Electronic Transactions Act (Title 30, chapter 18, part 1, MCA) may give legal validity to an "electronic record" of this nature—provided that certain conditions are met. The problem is that there is no admissible evidence showing that the conditions were, in fact, met here.

¶66 For starters, the email purports to be "From" Jory Ruggiero, "To" Guy Rogers, with "Cc" to "breting engel; Thomas Stoever; McDowell, Heather A." As we now know through parol evidence, Ruggiero drafted the email on his computer at the mediation site after a daylong mediation. According to the time stamp appearing on the printout of the

31

email, the email was sent at 9:56 p.m. on July 14, 2010. Yet, since the email was not sent from the email account of the party sought to be charged here (i.e., the Kluvers), the question arises whether Ruggiero had legal authority to bind the Kluvers to the terms of an email that they themselves did not draft, did not sign, and did not transmit. As will be seen, there is no admissible evidence that the Kluvers authorized Ruggiero to contractually bind them to the terms stated in his email.

¶67    Furthermore, the email sets forth "terms" which purport to "memorialize" a global settlement agreement "between all Plaintiffs in this matter, Bechtal and all Defendants, except Defendant Hydrometrics." It is captioned "Kluver et al. v. PPLM et. al Settlement Memorandum of Understanding." The email details concessions that each side will make in order to settle the parties' dispute. Among other things, the email requires "Plaintiffs" to convey fee simple title to certain land. Yet, since the Uniform Electronic Transactions Act applies only if the parties have agreed to conduct a transaction by electronic means, § 30-18-104(2), MCA, the question arises whether the Kluvers agreed to be bound to the sale of their ranchland by means of an email. As will be seen, there is no admissible evidence of an agreement by the Kluvers to conduct transactions by electronic means.

¶68    Finally, since the Uniform Electronic Transactions Act applies only to "actions occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs," § 30-18-102(18), -104(2), MCA, the question arises whether a mediation agreement between parties to settle a lawsuit constitutes business affairs, commercial affairs, or governmental affairs. The Court simply assumes the answer to

32

this question is "yes"—thereby extending the reach of the Uniform Electronic Transactions Act in ways the Legislature may not have intended.

¶69 In sum, there is a complete lack of evidence and authority supporting the Court's decision. Indeed, the Court's foundation for upholding the Ruggiero email as a binding contract is "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death." Abraham Lincoln, Sixth Debate with Stephen A. Douglas, at Quincy, Illinois (Oct. 13, 1858), in *The Collected Works of Abraham Lincoln* vol. 3, 245, 279 (Roy P. Basler ed., Rutgers University Press 1953). Before explaining in detail why the Ruggiero email is not a valid contract, I begin by summarizing the relevant legal principles. While the email purports to "memorialize" the terms of the parties' settlement, the Kluvers are concerned primarily with the question whether, "without having signed anything, [they] must part with land their family has ranched for four generations." I thus focus on the law applicable to this question.

## II. Legal Principles

¶70 **Statute of Frauds.** With exceptions not applicable here, an interest in real property may not be transferred unless there is an instrument in writing subscribed by the party transferring the property or by the party's lawful agent. Section 70-20-101, MCA; Opinion, ¶ 21. Indeed, an agreement to convey an interest in real property is "invalid" unless the agreement, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by the party's agent. Section 28-2-903(1)(d), MCA. Particularly significant to the analysis in this case, "[t]he agreement, if made by an agent

33

of the party sought to be charged, is invalid *unless the authority of the agent is in writing and subscribed by the party sought to be charged*." Section 28-2-903(1)(d), MCA (emphasis added); *accord* § 70-20-101, MCA; Opinion, ¶ 21.

¶71 **Uniform Electronic Transactions Act.** "If a law requires a record to be in writing, an electronic record satisfies the law." Section 30-18-106(3), MCA. "If a law requires a signature, an electronic signature satisfies the law." Section 30-18-106(3), MCA. An "electronic record" is "a record created, generated, sent, communicated, received, or stored by electronic means." Section 30-18-102(8), MCA. An "electronic signature" is "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Section 30-18-102(9), MCA. These provisions apply, however, "only to transactions between parties each of which has agreed to conduct transactions by electronic means." Section 30-18-104(2), MCA. "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Section 30-18-104(2), MCA. Importantly, a "transaction" is "an action or set of actions occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs." Section 30-18-102(18), MCA. "If parties have agreed to conduct a transaction by electronic means and a law requires a person to provide, send, or deliver information in writing to another person, the requirement is satisfied if the information is provided, sent, or

34

delivered, as the case may be, in an electronic record capable of retention by the recipient at the time of receipt." Section 30-18-107(1), MCA.

¶72   **Mediation Confidentiality Statute.** "A mediator's files and records, with the exception of signed, written agreements, are closed to all persons unless the parties and the mediator mutually agree otherwise." Section 26-1-813(3), MCA. With exceptions not applicable here, "all mediation-related communications, verbal or written, between the parties or from the parties to the mediator and any information and evidence presented to the mediator during the proceedings are confidential." Section 26-1-813(3), MCA. It bears emphasizing that this statute refers to "all" communications, whether verbal or written, that are "mediation-*related*" (emphasis added). The statute is written in broad language. If a communication is "related" to mediation, it is confidential. Furthermore, it also bears emphasizing that the only exception to the "closed" nature of the mediator's files and records is "*signed*, written agreements." Section 26-1-813(3), MCA (emphasis added). Hence, unless the Ruggiero email constitutes a "signed, written agreement" under the Mediation Confidentiality Statute, it is confidential and inadmissible.

### III.  Contract Analysis

¶73   With these principles in mind, I now address the failures of the Ruggiero email to satisfy the Statute of Frauds, and the methods the Court employs to circumvent these problems.

### 1.  Not a "Transaction"

35

¶74    Perhaps the most significant failing of the Ruggiero email is the fact that it was not signed by the persons to be bound—i.e., the Kluvers.  To remedy this problem, the Court first invokes the Uniform Electronic Transactions Act.  Opinion, ¶ 22.  This Act applies, however, only to a "transaction," § 30-18-104(2), MCA, which is defined as "an action or set of actions occurring between two or more persons *relating to the conduct of business, commercial, or governmental affairs*," § 30-18-102(18), MCA (emphasis added).  Without analysis or authority—indeed, without even acknowledging the question—the Court assumes that a "Settlement Memorandum of Understanding" between parties to a lawsuit constitutes "an action . . . relating to the conduct of business, commercial, or governmental affairs."  Section 30-18-102(18), MCA.  As an initial matter, I cannot agree with the proposition that this statutory definition encompasses *all* settlement memorandums between parties to a lawsuit.  But even if *some* settlement memorandums in *some* cases do satisfy the definition, I cannot agree that the memorandum in *this* case does.  The present lawsuit does not "relate to" a business affair, a commercial affair, or a governmental affair.  It relates to a claim for damages resulting from groundwater pollution.  The supposed settlement memorandum, moreover, arose out of a confidential mediation proceeding.  I therefore disagree with the Court's unstated premise that the Ruggiero email represents a "transaction" under the Uniform Electronic Transactions Act.  Hence, for this reason alone, Ruggiero's email cannot be a valid contract to which the Kluvers are bound.

## 2.  No Agreement to Conduct Transactions Electronically

36

¶75 Assuming, for the sake of argument, that the Ruggiero email is a "transaction," this does not automatically make the Uniform Electronic Transactions Act applicable. The Act applies "only to transactions between parties *each of which has agreed* to conduct transactions by electronic means." Section 30-18-104(2), MCA (emphasis added). What admissible evidence do we have that "each [party] has agreed to conduct transactions by electronic means"? There is none.

¶76 The Court contends, however, that the Ruggiero email itself is evidence of an agreement to conduct transactions—including the transfer of fee title to the Kluvers' ranchland—by email. Opinion, ¶ 24. Why? Because the email "is a writing created in email format on Ruggiero's computer during the mediation and explicitly states that the parties reviewed and approved it," and because "[a]t the conclusion of the mediation, it was transmitted by email from Ruggiero to Rogers." Opinion, ¶ 24. So, apparently, we know that each party agreed to conduct transactions by electronic means because one of the parties sent an email to the other parties, and the email recites that it "has been reviewed and approved by the parties and their counsel copied herein." This reasoning is completely circular and strains credulity beyond the breaking point.

¶77 First, other than what is recited in the email itself, there is no evidence that the parties did, in fact, review and approve the email. Second, and more importantly, even if the parties *did* review and approve the email, that fact is confidential under the Mediation Confidentiality Statute. As the Court acknowledges elsewhere in its Opinion, "*all of the evidence of conversations and conduct that occurred at the mediation was confidential*

37

*under § 26-1-813, MCA.*" Opinion, ¶ 58 (emphasis added). The statement in the email that "[t]his Memorandum has been reviewed and approved by the parties and their counsel copied herein" is "evidence of conversations and conduct that occurred at the mediation." Opinion, ¶ 58. As such, the statement is "confidential under § 26-1-813, MCA," Opinion, ¶ 58, and cannot be used to create an agreement to conduct transactions by electronic means.[1]

¶78 Lastly, there is nothing in the email indicating that Ruggiero intended it to be anything other than a summary of terms that the parties had agreed upon for settling the lawsuit. There is nothing in the email indicating that Ruggiero intended the email itself to serve as the final "signed, written agreement." Section 26-1-813(3), MCA. More to the point, there is nothing in the email establishing that *the Kluvers* "agreed to conduct transactions by electronic means." Section 30-18-104(2), MCA. Inferring such an agreement, as the Court does here, amounts to appellate bootstrapping.

¶79 Implicitly conceding that the Ruggiero email is insufficient in itself to establish an agreement to conduct a land transaction by email, the Court resorts to statements that Karson Kluver apparently made to the McRaes one or two days after the mediation. Opinion, ¶ 24. According to the District Court's findings, Karson "expressed sentiments

---

[1] Since the Court has determined, nonetheless, to attribute dispositive significance to the "reviewed and approved" statement in the Ruggiero email, thus ignoring its own pronouncement that "all of the evidence of conversations and conduct that occurred at the mediation was confidential," Opinion, ¶ 58, I note that the Kluvers were *not* present and thus could *not* have approved the email when it was finalized. The record reflects that the Kluvers left the mediation site while the email was still being drafted.

which acknowledged that a settlement of claims had been reached at the mediation." First of all, however, the fact that such communications are "mediation-related" makes them confidential under the Mediation Confidentiality Statute and, thus, inadmissible. Section 26-1-813(3), MCA. Secondly, expressing sentiments which acknowledge that a settlement of claims has been reached is not even remotely, under the most liberal of interpretations, evidence of an agreement "to conduct transactions by electronic means." Section 30-18-104(2), MCA. The Court is grasping at straws in using Karson's privileged remarks to the McRaes about the existence of a presumed settlement to establish the existence of an agreement by him to conduct legally binding transactions by email.

¶80 In sum, the Ruggiero email purports, at most, to "memorialize" terms that the parties had agreed upon, during the mediation, for proceeding with the settlement of the lawsuit. It is by no means an agreement to conduct transactions by electronic means. Hence, for this reason as well, the email is not a valid contract to which the Kluvers are bound.

### 3. Ruggiero's Authority to Act as Agent

¶81 Assuming, for the sake of argument, (1) that the Ruggiero email is a "transaction" and (2) that the Kluvers agreed to conduct transactions by electronic means, the next obstacle the Court faces is the fact that the Kluvers did not draft, did not sign, and did not

transmit the email. Ruggiero did all of that.[2] It becomes necessary, therefore, to establish that Ruggiero had authority to take these actions as the Kluvers' agent. As noted, an agreement to convey an interest in real property is invalid unless the agreement is in writing and subscribed by the party to be charged or by the party's agent; and if the agreement is made by the party's agent—as it allegedly was here—the agreement "is invalid unless the authority of the agent is in writing and subscribed by the party sought to be charged." Section 28-2-903(1)(d), MCA. What admissible evidence, then, do we have that "the authority of [Ruggiero] is in writing and subscribed by the [Kluvers]"? There is none. And that should be the end of the analysis.

¶82 The Court, however, decides to simply dispense with this writing requirement. The Court proceeds to adopt a "physical proximity" exception to the plain and unambiguous language of § 28-2-903(1)(d), MCA. Opinion, ¶¶ 27-29. This is a clear violation of the most fundamental maxim of statutory construction: "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, *not to insert what has been omitted* or to omit what has been

---

[2] I am not going to embark on a lengthy discussion of the Court's conclusion that Ruggiero electronically signed his email. Suffice it to say that some of the Court's reasoning in this regard is dubious, particularly the Court's observation that Ruggiero's name appears in the "From" section of the email. Opinion, ¶ 26. As anyone familiar with junk email knows, the "From" field can be manipulated to make it appear that an email is coming from someone other than the true sender. In any event, an "electronic signature" is "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Section 30-18-102(9), MCA. I shall assume, for the sake of discussion only, that Ruggiero did in fact draft and transmit the email at issue, and that his clicking the "Send" button was an electronic "process" he executed "with the intent to sign the record."

inserted." Section 1-2-101, MCA (emphasis added); *accord* Opinion, ¶ 53. As support for its approach, the Court cites a 149-year-old case from California, plus an 1894 decision from Nebraska and a 1925 decision from Idaho. Opinion, ¶ 27 & n. 3. Yet, regardless of the law in those states, and whether that law is still valid in those states, our decision here is controlled by Montana law—§ 28-2-903(1)(d), MCA—which does not contain the exception the Court manufactures today. Section 1-2-101, MCA.

¶83 Another flaw in the Court's adoption of such an exception here is the fact that it violates the Mediation Confidentiality Statute. The Court holds that the "physical proximity" exception shall apply "in the context of a mediation session." Opinion, ¶ 28. According to the California, Nebraska, and Idaho cases cited by the Court, this exception " 'arises from the doctrine that what one does in the presence of *and by the direction of* another is the act of the latter.' " Opinion, ¶ 27 (emphasis added) (quoting *Videau v. Griffin*, 21 Cal. 389, 392 (Cal. 1863)); *see also* Opinion, ¶ 27 n. 3 (" ' "If it is signed in his presence *by his direction*, an oral request to do the act is all that is required." ' " (emphasis added) (quoting *Bigler v. Baker*, 58 N.W. 1026, 1029 (Neb. 1894), in turn quoting *McMurtry v. Brown*, 6 Neb. 368, 375 (Neb. 1877))); Opinion, ¶ 27 n. 3 (" ' "One may write and execute an instrument by the hand of another when done in his presence *and by his direction*, and the fact may be proved by parol evidence." ' " (emphasis added) (quoting *Leaf v. Codd*, 240 P. 593, 596 (Idaho 1925), in turn quoting *Morton v. Murray*, 51 N.E. 767, 770 (Ill. 1898))). As all of these cases reflect, it is not merely physical presence that triggers the exception. It is the fact that the agent acted "by the direction

41

of" his principal while in the principal's presence. In the *Morton* case, for example, the letter from Murray (the principal) "was written in his presence, by his dictation, and in his name" by Mrs. Murray (the agent). 51 N.E. at 769. If we are to apply this rule, as the Court states, "in the context of a mediation session," then we must know not only that the agent and the principal were in physical proximity, but that the agent acted "by the direction of" the principal. Yet, in order to know this, we must consider "conversations and conduct that occurred at the mediation"—evidence that the Court correctly holds is confidential under § 26-1-813, MCA. Opinion, ¶ 58. Thus, there can be no "physical proximity" exception to § 28-2-903(1)(d), MCA, in the mediation context without negating the confidentiality requirement of § 26-1-813, MCA.

¶84 Still another flaw in the Court's application of this exception here is the lack of any evidence that the Ruggiero email "was written in [the Kluvers'] presence, by [their] dictation, and in [their] name." *Morton*, 51 N.E. at 769. Indeed, as noted earlier, the record reflects that the Kluvers left the mediation site while the email was still being drafted. Moreover, even assuming they were in physical proximity to Ruggiero, there is not a shred of evidence that the Kluvers "directed" him to electronically sign the email on their behalf, as the foregoing cases require.

¶85 Hence, for this third reason as well, the Ruggiero email is not a valid contract to which the Kluvers are bound.

**4. Statute of Frauds Not Complied With**

42

¶86 In sum, what we have is an email drafted and transmitted by Ruggiero purporting to memorialize the terms of a settlement. We have no idea whether anyone agreed with what Ruggiero wrote, because "all of the evidence of conversations and conduct that occurred at the mediation was confidential under § 26-1-813, MCA." Opinion, ¶ 58. We also do not know whether the Kluvers gave Ruggiero authority to act as their agent, or whether the Kluvers agreed to conduct transactions by electronic means (assuming that a mediation settlement is a "transaction"). There is no admissible evidence establishing any such agreements.

¶87 To deal with these problems, the Court finally decides that the Statute of Frauds is inapplicable in any event, and thus that there is no need for a writing signed by the Kluvers. Why? Because Karson spoke with the McRaes after the mediation and acknowledged that a settlement had been reached. Opinion, ¶ 30. As I have already pointed out, these communications are "mediation-related" and, thus, confidential and inadmissible. Section 26-1-813(3), MCA. Furthermore, all Karson did (according to the District Court's findings) was drive to the McRaes' ranch yard "[o]ne or two days after the mediation" and "express[ ] sentiments which acknowledged that a settlement of claims had been reached at the mediation." This hardly constitutes an admission of "the existence of a contract." Opinion, ¶ 30. And it certainly does not qualify as an admission that Ruggiero had been given authority to act as the Kluvers' agent in a land transaction, or that the Kluvers had agreed to conduct transactions by electronic means.

43

¶88 The Court's reliance on *Hayes v. Hartelius*, 215 Mont. 391, 697 P.2d 1349 (1985), is wholly unavailing. There, we observed that "[t]here is no question but that the parties made a contract for the purchase of the Hartelius home. They made an oral agreement which was further consented to by conduct." *Hayes*, 215 Mont. at 395, 697 P.2d at 1352. That conduct consisted of the Hayes moving into the house, making a down payment of $10,000, and making good and timely payments in accordance with the agreement for over a year. *Hayes*, 215 Mont. at 395, 697 P.2d at 1352. Here, in contrast, Karson acknowledged at most that the parties had seemingly reached a settlement of their claims. He did not admit that the Ruggiero email constituted a binding contract or that he had given Ruggiero authority to act as his agent. Section 28-2-903(1)(d), MCA.

¶89 As indicated, I do not agree with the Court's reliance on Karson's remarks to the McRaes. But since the Court is determined to use inadmissible evidence in an effort to uphold the Ruggiero email as an enforceable contract, I think certain communications left out of the Court's Opinion ought to be acknowledged. At 4:24 p.m. on July 15, 2010, which is the day after the mediation, defense counsel (Guy Rogers) replied to Ruggiero's email with the following email of his own:

> Hi Jory [Ruggiero] and Bret [Engel]:
>
> We have made a few modifications to the Settlement Memorandum of Understanding after you emailed us the draft late last night. I don't think our modifications change the substance of the agreement. We are just trying to clarify several issues. If you have any problem with the modifications, please let me know.

Jory, I also tried late this afternoon to give you a call to discuss several settlement issues. At your convenience, please give me a call. Thanks, Guy.

Ruggiero replied to Rogers' email 42 minutes later with the following email:

Guy,

As we discussed by telephone this afternoon, Plaintiffs will work with Defendants to iron out the details of the settlement documentation, including Defendants' modifications to the MOU. I will discuss the proposed changes to the MOU with co-counsel and my clients and talk with you about them over the course of the coming week. Thanks.

Jory

This correspondence—particularly defense counsel's characterization of the "Settlement Memorandum of Understanding" as a "draft"—undermines the Court's supposition that Ruggiero's first email constituted the parties' "signed, written agreement." Section 26-1-813(3), MCA. Notably, on July 16, 2010, two days after the mediation, Ruggiero advised the District Court that the parties had reached a "*tentative* settlement agreement" (emphasis added), further undermining the Court's tenuous efforts to uphold Ruggiero's July 14 email as the final, legally binding expression of the parties' intent.

¶90 The Court brushes these facts aside, citing the District Court's characterization of counsel's language as "inartful and, *in hindsight*, imprecise." Opinion, ¶ 39 (emphasis added). The fact remains, however, that our review here is de novo, Opinion, ¶ 19, and the terms "tentative" and "draft" constitute objective evidence that Ruggiero's July 14 email was *not* the parties' final agreement. Indeed, Rogers testified that "I used the word draft because we did it after 14 hours of mediation and we all got tired." He admitted

45

that "[w]e knew we had it to tweak, elaborate on a few issues . . . ." In light of this testimony, it seems to me that the Ruggiero email was not the parties' "signed, written agreement" but, rather, was a "mediation-related communication" made in the process of reaching a final "signed, written agreement." Section 26-1-813(3), MCA.

¶91 In any event, returning to the Court's conclusion that the Statute of Frauds is inapplicable, I find it utterly implausible that a person's (Karson's) offhand expression of relief that a case seemingly has settled is enough to remedy (1) the absence of an agreement to conduct transactions by electronic means, § 30-18-104(2), MCA, and (2) the absence of written authorization for an agent to enter into an agreement to sell real property on behalf of his principal, § 28-2-903(1)(d), MCA. If the sorts of remarks Karson made are enough to satisfy these statutory writing requirements, then these requirements are utterly meaningless.

### 5. No Consent

¶92 Having disposed of the Statute of Frauds, the Court considers whether the Kluvers consented to the Ruggiero email. The Court acknowledges that a party is bound to a settlement agreement if he or she has "manifested assent" to the agreement's terms. Opinion, ¶ 33. The intentions of the parties, the Court notes, "are those disclosed and agreed to *in the course of negotiations*." Opinion, ¶ 33 (emphasis added). One might wonder, however, how we could possibly consider what intentions the Kluvers "disclosed and agreed to in the course of negotiations" when, as the Court acknowledges elsewhere in its Opinion, "all of the evidence of conversations and conduct that occurred at the

46

mediation was confidential under § 26-1-813, MCA." Opinion, ¶ 58. The Mediation Confidentiality Statute prohibits us from doing precisely what the Court says is necessary to determine consent to the Ruggiero email, namely, examine the parties' intentions "disclosed and agreed to in the course of negotiations." Opinion, ¶ 33. The Court's analysis in this regard is a blatant violation of the statute.

¶93 The Court's reliance on *Marta Corp. v. Thoft*, 271 Mont. 109, 894 P.2d 333 (1995), is unavailing. First of all, *Marta* was decided four years *before* the Legislature enacted the Mediation Confidentiality Statute. *See* Laws of Montana, 1999, ch. 481, § 1 ("An Act Providing for Confidentiality in Mediation Proceedings; Creating a Mediation Privilege for Mediators and Parties to Mediation; Amending Sections 40-4-303 and 41-3-404; and Repealing Section 26-1-811, MCA."). Accordingly, even if *Marta* could be interpreted as permitting us to consider evidence of conversations and conduct that occurred during a mediation, the decision has been abrogated by the Legislature's subsequent enactment of § 26-1-813, MCA.

¶94 Secondly, *Marta* is factually distinguishable from the present case in any event. The settlement there was not pursuant to mediation. It was pursuant to a court-initiated settlement discussion on the first day of trial:

> On May 12, 1994, the morning of the scheduled trial, the court initiated settlement discussions, during which the parties agreed to general settlement terms. The court directed the parties' attorneys to meet and prepare a stipulation for entry of an order. The court scheduled a meeting for 6:00 p.m. on May 19, 1994 for entry of the order. On May 16, 1994, Respondents' counsel sent a draft stipulation to Appellants' counsel. On May 19, 1994, Respondents' counsel sent Appellants' counsel the final

47

form of the stipulation: Appellants' counsel signed and mailed the stipulation to the court and the parties that same day. He did not have client approval but anticipated their approval . . . . Appellants received the stipulation on May 23, 1994 and they concluded that the written stipulation was unacceptable.

*Marta*, 271 Mont. at 111, 894 P.2d at 334 (paragraph break omitted). This Court held that Appellants were bound by the stipulation nonetheless, because

there were no conditions placed on Appellants' acceptance of the settlement agreement. Appellants and Respondents were present and represented at the settlement discussion and therefore were party to the agreement on general terms. Although Appellants argue strenuously, after the fact, that the written stipulation did not meet their wishes and was unacceptable to them, they do not point to any specific instances wherein the written stipulation is contrary to what they agreed to at the May 12 settlement conference.

*Marta*, 271 Mont. at 113, 894 P.2d at 335. For obvious reasons, the court-initiated "settlement discussion" in *Marta*—which was not governed by a mediation privilege—is entirely distinguishable from the mediation proceeding in the present case—which is governed by a mediation privilege.

¶95 Ironically, while the Court criticizes the District Court for wrongly basing its decision on evidence of what occurred at the mediation, Opinion, ¶ 35, the Court then proceeds to base its own decision on the very same thing. Specifically, the Court points to the statement in Ruggiero's email that it was "reviewed and approved" by the parties. Opinion, ¶ 35. Yet, the fact that the parties presumably all walked over to Ruggiero's computer, reviewed what he had written, and approved it is "evidence of conversations and conduct that occurred at the mediation," which "was confidential under § 26-1-813,

MCA." Opinion, ¶ 58. The Court's Opinion is riddled with conflicts and contradictions. Furthermore, even if we *could* rely on the "reviewed and approved" sentence, it must not be forgotten that the Kluvers did not electronically sign the Ruggiero email. Ruggiero did—which brings us back to the question whether the Kluvers gave him authority to act as their agent. As discussed already, there is no evidence that the Kluvers did so.

¶96 Lacking any admissible evidence that the Kluvers consented to be bound by the Ruggiero email, the Court ultimately turns this requirement on its head. "A party to a settlement agreement is bound if he or she *manifested assent* to the agreement's terms." *Murphy v. Home Depot*, 2012 MT 23, ¶ 8, 364 Mont. 27, 270 P.3d 72 (emphasis added). The Court acknowledges this principle, Opinion, ¶¶ 31, 33, yet then holds—citing *Marta*, an inapplicable precedent—that "there is nothing on the face of the MOU suggesting that the Kluvers *did not intend* to be bound by it," Opinion, ¶ 35 (emphasis added). The dispositive question is whether the Kluvers manifested an intent to be bound, not whether they manifested an intent *not* to be bound. *Murphy*, ¶ 8.

### 6. Missing Terms

¶97 Having found the consent element satisfied, the Court turns to the next issue: essential terms. The Ruggiero email did not include many of the practical details and terms needed for its execution. As noted, Ruggiero himself characterized his email as a "tentative" settlement agreement, and defense counsel likewise characterized it as a "draft." Rogers stated in an email to Ruggiero the next day: "We have made a few

49

modifications to the Settlement Memorandum of Understanding after you emailed us the draft late last night."

¶98   In order to remedy this problem, the Court relies on *Hurly v. Lake Cabin Dev., LLC*, 2012 MT 77, 364 Mont. 425, 276 P.3d 854.  Opinion, ¶¶ 37-38.  In that decision, we reversed the trial court and saved a contract based on the appellees' waiver of the contract-formation problems at issue.  *Hurly*, ¶ 29.  There is no evidence of any such waiver of the lack-of-detail defects in the purported settlement agreement here, however.  Kluvers dispute any notion of waiver.  Accordingly, *Hurly* is inapposite.

### 7.  Failure to Perform

¶99   Lastly, the parties failed to perform their duties within the 60-day period set forth in the Ruggiero email.  To alleviate the problem of the District Court's failure to make a finding of fact that would benefit Appellees' argument in this regard, the Court invokes the doctrine of "implied findings."  Opinion, ¶ 41.  I am not persuaded that this doctrine is applicable here, where our review of the contract's validity is de novo.  Moreover, I am not persuaded that this doctrine can singlehandedly overcome the numerous problems going to the validity of the alleged contract at issue.

### 8.  The Court Undermines Its Analysis

¶100  Having concluded in Issue One that an enforceable settlement agreement exists, the Court is forced, in Issue Three, to deal with the District Court's violations of the confidentiality requirements of § 26-1-813, MCA.  The evidence admitted as a result of

these violations undergirded the District Court's conclusion that the Ruggiero email is a valid contract.

¶101 At the outset of its Issue Three analysis, the Court quotes portions of § 26-1-813, MCA, and recognizes that the statue provides a blanket confidentiality protection for mediation proceedings and all mediation-related communications and materials—such as conversations, position statements, offers, rejections, agreements, disagreements, files, records, and advice from counsel and the mediator. Opinion, ¶ 52; § 26-1-813(2)(a), (3), MCA. The Court recites the three statutory exceptions to the confidentiality protection: if disclosure is (a) required by statute, (b) agreed to by the parties and the mediator in writing, or (c) necessary to establish a claim on behalf of the mediator in a controversy between a party to the mediation and the mediator. Opinion, ¶ 52; § 26-1-813(5), MCA. The Court, somewhat ironically, states that it will apply a plain-language approach to interpreting the statute. Opinion, ¶¶ 53, 55. Finally, having stated these principles, the Court proceeds into its analysis. As will be seen, however, the Court's holdings under Issue Three effectively obliterate the foundation of its holding under Issue One.

¶102 First, the Court takes the position that because a settlement agreement exists, the District Court did not err in admitting the Ruggiero email into evidence. Opinion, ¶ 55. Of course, without the mediation evidence, it would have been impossible for the District Court, and now this Court, to conclude that there was a valid settlement agreement in the first place. Indeed, the Kluvers did not sign a settlement agreement, and there is no evidence that Ruggiero had authority to bind the Kluvers—unless one first manufactures

51

an exception to the plain language of § 28-2-903(1)(d), MCA, and then considers and draws inferences from inadmissible mediation-related communications and conduct.

¶103 Second, although the Court purports to adopt a strict reading of § 26-1-813, MCA, *see* Opinion, ¶¶ 53, 55-56, 59, the Court inexplicably cites *In re Estate of Stukey*, 2004 MT 279, ¶ 71, 323 Mont. 241, 100 P.3d 114, for the proposition that post-mediation communications are not covered by § 26-1-813, MCA, *see* Opinion, ¶ 55. While *Stukey* may indicate this, the virtually nonexistent reasoning in that part of the *Stukey* opinion ignores the plain language of § 26-1-813(3), MCA, which states: "all mediation-related communications, verbal or written, between the parties . . . are confidential." The privilege expressly applies to "all" communications that are "mediation-related," § 26-1-813(3), MCA, not just those that occur "*during* the course of the mediation proceeding," Opinion, ¶ 55 (emphasis in original). Notably, in rejecting Appellees' argument that "ministerial" communications are not covered by the mediation statute, the Court observes that the proponents of § 26-1-813, MCA, "emphasized that mediation was a growing method of resolving disputes, founded on two key principles—that the parties feel free to speak their mind, and that their confidence will be maintained." Opinion, ¶ 56. The Court further observes that "[b]ecause the statute is designed to promote a candid exchange, the participants must be assured that what they say will not be used against them through later court proceedings." Opinion, ¶ 56. Given these policies, it makes *no* sense to exempt mediation-related communications that occur before or after the mediation proceeding itself. Certainly there is nothing in the actual language of the

statute supporting such a distinction; to the contrary, the statute expressly applies to "*all* mediation-related communications." Section 26-1-813(3), MCA (emphasis added). *Stukey* was wrongly decided and should be overruled, not followed, on this point.

¶104 Third, the Court determines that "communications" under § 26-1-813(3), MCA, include both statements and nonverbal conduct meant to inform (such as nodding). Opinion, ¶¶ 57, 58. Conversely, "smoking a cigarette" or "physical presence" at the mediation is not a "communication." Opinion, ¶¶ 57, 58. Yet, if mere physical presence is not a communication—and I agree with the Court that it is not—then the Court's "physical proximity" analysis under Issue One falls apart. Again, that analysis purports to supplant the statutory requirement of written authority by a principal granting his agent authority to sign a contract involving realty. Opinion, ¶¶ 27-29. The mere fact that the Kluvers were physically present with Ruggiero at the mediation proceeding could not, in and of itself, communicate to Ruggiero that he had authority to sign his email as their agent. There had to be some sort of communication of that authority. Mediation-related "communications," however, are precisely what § 26-1-813(3), MCA, prohibits us from considering. They are confidential and privileged and, thus, cannot form the basis for establishing a valid contract in the first instance.

¶105 The Court concedes this point, explaining that

> since the statute does not include any special provisions allowing disclosure of confidential information to prove or refute contract defenses, parties arguing for or against the enforceability of a contract created during mediation are quite limited in the evidence they can use to support their case. Some state legislatures have addressed this issue by explicitly

53

> providing exceptions to mediation confidentiality in their statutes when the enforceability of the mediated agreement is at issue. However, our Legislature conspicuously did not, and to carry out its purpose of encouraging mediation by ensuring strict confidentiality we are reluctant to allow exceptions. As stated above, it is not the job of this Court to insert into those statutes what the Legislature has chosen to omit.

Opinion, ¶ 59 (footnote omitted). In light of these principles, which I believe are correct, I simply cannot understand the Court's willingness (indeed, apparent eagerness) to transform the Ruggiero email into a binding contract by creating exceptions to multiple statutory writing requirements and by relying on inadmissible evidence of various mediation-related communications and conduct—including the Kluvers' supposed review of Ruggiero's email during the mediation, their supposed approval of the email during the mediation, their supposed direction to Ruggiero to electronically sign the email on their behalf, and Karson's post-mediation communication to the McCraes about the mediation and the assumed outcome of it. All of this evidence is confidential and privileged under § 26-1-813, MCA. If this Court would simply follow the strict-interpretation rule that it espouses, then the Kluvers' communications and conduct during and after the mediation would be kept confidential, as the statute requires. While this might mean that Appellees "are quite limited in the evidence they can use to support their case," Opinion, ¶ 59, that is a policy choice that the Legislature has made. It is not this Court's job to overrule this policy decision in an effort to rescue the instant settlement agreement.

### 9. Conclusion of Contract Analysis

¶106 It is said that hard cases make bad law. The Court's Opinion here proves the wisdom of that maxim. In my view, the Court has crafted a decision in the form of a house of cards so as to uphold a purported settlement agreement that has more holes in it than a dam made of Swiss cheese. It is not this Court's job to make a contract for the parties; it is the parties' obligation to do so. And to the extent they have failed, this Court should simply say so and let the parties figure out how to deal with the consequences.

¶107 While the Court may view today's decision as a good result in this case—believing as it does, I suspect, that the Kluvers were suffering from buyers' remorse and were trying themselves to commit a "fraud"—the truth is that we have nonetheless sacrificed the law and set bad precedent to reach that result. The Court overreaches to hold that the Ruggiero email meets the prerequisites of the Uniform Electronic Transactions Act, complies with the Statute of Frauds, and satisfies the mutual-consent and essential-terms requirements. The Court's decision to affirm is built on a house of cards—pull any one out, and the whole thing falls apart. I cannot agree with the Court's analysis upholding the Ruggiero email as "a binding, enforceable settlement agreement."[3] Opinion, ¶ 42.

---

[3] Given this conclusion, I would not reach Issue Two. But assuming, for the sake of argument, that the Ruggiero email constitutes an enforceable contract, the Court makes the reasonable point that, in light of the "circumstances" cited at ¶¶ 47-48 of the Opinion, it makes no sense that the so-called "perpetual first option to purchase" was intended to be an option to purchase rather than a right of first refusal. What I find appalling is the "inartful" language used by the Kluvers' counsel. The difference between an option to purchase and a right of first refusal has been clear in our caselaw since at least 1991. Opinion, ¶ 46 (citing *Lee v. Shaw*, 251 Mont. 118, 121, 822 P.2d 1061, 1063 (1991)).

## IV. Harmless-Error Analysis

¶108 Although the Court concludes that the District Court erred by admitting evidence protected under § 26-1-813, MCA—notably, the Court does not specify exactly what that evidence is, other than to suggest that it includes "all of the evidence of conversations and conduct that occurred at the mediation" (Opinion, ¶ 58)—the Court then holds that this error was harmless. Opinion, ¶ 60. The reason: "[E]ven if the District Court had excluded the confidential information from the mediation, it would have arrived at the same conclusion." Opinion, ¶ 60. This assertion is completely speculative. Indeed, it is reminiscent of the reputed powers of Johnny Carson's famous Carnac the Magnificent. The majority holds the District Court's order to their collective heads and divines the trial judge's mental processes. It cannot be done.

¶109 Perhaps what the Court means to say is that while the District Court erred, it ultimately reached the correct result. I agree that we could affirm on this basis, if it were true. The problem is that it is not true. If we exclude the "mediation proceedings," which are confidential, § 26-1-813(2)(a), MCA, and "all mediation-related communications, verbal or written, between the parties," which also are confidential, § 26-1-813(3), MCA,

There is simply no plausible excuse for referring to the latter as a "perpetual first option to purchase." Doing so was careless, to put it mildly. Worse still, it put the District Court and this Court in the untenable position of having to rely on parol evidence to make sense of a provision that easily could have been worded in accordance extant caselaw.

I also note here that I am not addressing the breaches of attorney-client privilege referred to at ¶ 61 of the Opinion. Suffice it to say that the Court's reasoning is equally fallacious. Mediation confidentiality and the attorney-client privilege have taken an equally hard hit under the Court's decision today.

there is no evidence remaining that the Kluvers consented to be bound to the Ruggiero email. The Kluvers did not sign the email, and there is no admissible evidence that they gave Ruggiero authority to do so on their behalf. All we have is an email, "inartfully" drafted at the end of a daylong mediation proceeding, that is not signed by the party to be charged. It is invalid under § 28-2-903(1)(d), MCA, and it is our duty to so hold.

### V. Conclusion

¶110 In closing, I would note that anyone reading the briefs and record in this case will recognize that the litigation and settlement attempt were nasty for any number of reasons. Nastiness, however, does not excuse what in my view were wholesale violations of the Mediation Confidentiality Statute by the District Court, and it does not justify this Court in constructing a binding settlement agreement in the manner described above—i.e., the house of cards—so as to affirm the District Court's erroneous approach and decision.

¶111 Henceforth, those participating in mediations—mediators, counsel, and litigants alike—should approach the mediation process in this State knowing that the strict confidentiality provisions of § 26-1-813, MCA, can and will be nullified by judicial legerdemain. These individuals should be particularly wary about any mediation-related communications that do not occur "*during* the course of the mediation proceeding" itself. Opinion, ¶ 55 (emphasis in original). The Court has deemed those to be fair game. Even an offhand expression of relief that a mediation proceeding was a seeming success can be used to establish (1) assent to an email purporting to memorialize settlement terms, (2) an

57

implicit agreement to conduct legal transactions by email, and (3) an implicit grant of authority to an agent to sign a contract involving realty on behalf of his principal.

¶112 In adopting § 26-1-813, MCA, the Legislature envisioned "a private, confidential, informal dispute resolution process in which an impartial and neutral third person, the mediator, assists disputing parties to resolve their differences." Section 26-1-813(1), MCA. Mediation is a "process," not just one official "proceeding." Throughout this "process," the parties are supposed to "feel free to speak their mind," knowing "that their confidence will be maintained." Opinion, ¶ 56. The statute is designed to promote "a candid exchange," and thus the participants must be assured "that what they say will not be used against them through later court proceedings." Opinion, ¶ 56. With today's decision, that vision and these assurances are out the window. The Court's Opinion here does a serious disservice and damage to the mediation process.

¶113 I would reverse. I dissent.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter dissents.

¶114 Although I could agree with several of the points made in Justice Nelson's Dissent, I am not inclined to parse the nuances of contract law or the Statute of Frauds, or deliberate the fine points of the Uniform Electronic Transactions Act. I cannot agree

58

with the Court's Opinion because—all other issues aside—the proceeding before the District Court, the results of which are affirmed here, violated the express provisions and intent of § 26-1-813, MCA. Moreover, the error committed by the District Court was not harmless.

¶115 The statute at issue, § 26-1-813, MCA, is part of the Montana Code Annotated chapter on evidence which covers privileges. Section 26-1-801, MCA, sets forth the policy on privileges. It provides: "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the cases enumerated in this part." As reflected in the Court's discussion at ¶¶ 8-13, the relations of the parties to the instant mediation did not remain confidential, much less inviolate. Affidavits detailing the negotiations during the mediation proceeding were filed in court, and were followed by the sworn testimony of mediation participants at the evidentiary hearing. These proceedings constituted a blatant violation of the general provisions of § 26-1-801, MCA, and the specific provisions of § 26-1-813, MCA. This being so, we err in making prodigious efforts to uphold the District Court's decision.

¶116 The Court goes off the rails when it equates the mediation to a settlement conference, and the MOU to a settlement agreement. Opinion, ¶¶ 31-39. Settlement agreements are indeed subject to the provisions of contract law, and parties may be bound to the settlement agreements they have negotiated. However, the agreement ostensibly reached here was not reached at a settlement conference; it was reached at a mediation.

59

As such, unless the parties had agreed otherwise, the negotiations and proceedings among the parties and the mediator were first and foremost subject to the express statutory confidentiality provisions of § 26-1-813, MCA, and the law on privileges. This is not a simple matter of contract law.

¶117 The *parties* did not waive the confidentiality provisions of the statute, though they could have done so in writing and with the agreement of the mediator at any time prior to, during, or subsequent to the mediation. Section 26-1-813(5)(b), MCA. When it appeared that Kluvers did not intend to honor the agreement purportedly reached at the mediation, the Power Companies, the McRaes, and their counsel promptly opted to waive confidentiality. However, the Kluvers did not do so, and in fact consistently asserted the privilege. Opinion, ¶¶ 9-12. Whatever the equities of the Kluvers' position, the Kluvers were within their rights to invoke the privileges of the statute. It is the law in Montana that whenever two or more persons are joint holders of a privilege, a decision by one joint holder of the privilege to waive it "does not affect the right of another joint holder to claim the privilege." M. R. Evid. 503(b).

¶118 Because the Kluvers lawfully and consistently invoked their statutory privilege, and the parties did not agree to waive the privilege in writing as the statute permits, the District Court erred in declaring that the Kluvers waived their right to confidentiality. The communications between Kluvers and McRaes were protected "mediation-related communications" under § 26-1-813(3), MCA. Moreover, the fact that the Kluvers discussed the case with McRaes on two occasions after the conclusion of the mediation

60

does not result in a waiver in any event, as McRaes were co-parties to the mediation and not strangers to the transaction. *See e.g. American Zurich Ins. Co. v. Mont. Thirteenth Judicial Dist. Court*, 2012 MT 61, ¶ 20, 364 Mont. 299, 280 P.3d 240 (voluntary disclosure of privileged communications to a *third party* results in waiver of the privilege).

¶119 Once the Kluvers asserted the privilege and objected to violation of the mediation confidentiality statute, the District Court erred in allowing other parties to the mediation to testify over their objection concerning the communications made during the mediation. Section 26-1-813(4), MCA, expressly provides that, except as provided in subsection (5) (which provides for a written agreement by the parties and the mediator agreeing to disclosure), "the parties to the mediation and a mediator . . . may not be examined in any action as to any communication made during the course of the mediation proceeding *without the consent of the parties to the mediation and the mediator.*" (Emphasis added.) The Kluvers did not consent. Therefore, the ensuing District Court proceedings were patently unlawful.

¶120 The admission in District Court of the testimony of the other mediation participants was not harmless error. Though the Court professes to reach the result here premised solely upon the MOU and the map, and not upon the testimony received during the court proceedings, the assumptions underlying the whole of the Court's Opinion belie this assertion. In this regard, I agree completely with ¶ 107 of Justice Nelson's Dissent. To reach its result, the Court accepts as fact information gleaned from testimony in the

District Court to the effect that the Kluvers reviewed and approved the emailed agreement and directed their counsel to sign the agreement on their behalf. Indeed, the Court must embrace this evidence in order to reach the threshold conclusion that the MOU constitutes a "signed, written agreement" that would be admissible under the provisions of § 26-1-803(3), MCA. As Justice Nelson observes, the Court has built a house of cards. It is simply impossible to reach the decision the Court reaches here without first assuming as true matters the admission of which was error in the first instance.

¶121 Rules of privilege have the effect of excluding otherwise relevant evidence because of the public policy of protecting confidential communications. Commission Comments to Article V of the Montana Rules of Evidence. "From society's perspective, the rules governing privileges can be justifiably viewed as the most important evidentiary doctrines." Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 1.1 (2d ed., Wolters Kluwer 2009). We cannot ignore the fact that the Legislature has chosen to cloak mediation proceedings with confidentiality protections equivalent to those extended to attorney-client or priest-penitent communications. Rules of privilege are undeniably inconvenient in situations such as this; however, courts are not free to skirt or ignore these statutory guarantees in the interests of expediency. Unfortunately, in its desire to achieve an arguably equitable result, this is what the Court has done.

¶122 For the foregoing reasons, I disagree with much of the Court's discussion and its ultimate conclusion that the admission of evidence protected under the mediation

confidentiality statute was harmless error.  I would therefore reverse, and I dissent from the Court's failure to do so.

/S/ PATRICIA COTTER